DARYL CARMAN, Adm'r of the Estate of Kelli Nicole Carman, Deceased, *et al.*, Plaintiffs-Appellants, *v.* ANTON DIPPOLD, Defendant-Appellee.

Fourth District   No. 14556

Opinion filed August 18, 1978.

Joseph W. Phebus and George G. Bryan, both of Urbana, for appellants.

Richard F. Record, Jr., and Gregory C. Ray, both of Craig & Craig, of Mattoon, for appellee.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:
Doctor Anton Dippold, M.D., had delivered 1,400 babies over the prior 20 years.

But the Carman baby died.

Medical malpractice alleged.

Jury held for the physician.

We must reverse.

Jette Carman entered into labor on March 31, 1975, and was sent to Mattoon Memorial Hospital after being checked by Dr. Dippold. At approximately 6:20 p.m., Dr. Dippold artificially ruptured Jette Carman's uterine membranes to help speed delivery through a medical procedure known as amniotomy. This was the first time he was aware that the baby was in a breech position (aftercoming head) as opposed to the normal cephalic position (head first). A previous check of the fetal heart tones had suggested that the baby was in a cephalic position.

Jette Carman and the attending nurse both stated that when the membranes were ruptured the doctor did not inform Carman as to the baby's breech position. Dr. Dippold, however, believed he did inform her, but did not "make a production of it" as her pressure had gone up and he did not want to excite her any more. He felt that it was his job to be aware of the possibilities and consequences. But Doctors Morhaim, Hamilton, and Lin testified at trial that they believed the parents should be informed of a baby's abnormal position.

Shortly after Mrs. Carman's membranes were ruptured, Nurse Parkhurst discussed with Dr. Dippold the guidelines that were posted in the labor department of the hospital. Those guidelines read in part:

"MEMBERS OF THE STAFF
TO WHOM IT MAY CONCERN:
Please observe the following suggestions to upgrade the OB Department's performance.
1. No amniotomy unless in labor.
2. No amniotomy until presenting part is engaged.
3. All breech—
    (a) pelvimetry should be ordered.
    (b) amniotomy should not be done.

\* \* \*

CONSULTATION
Members without full privileges should seek a consultation with a member of the staff with full privileges in the following cases: (Primi means nullipara here.)
    1. Primi inductions
    2. Primi breech

\* \* \*

    12. Fetal distress

\* \* \*

Hong C. Lin, M.D.
Chief
Department of Obstetrics and Gynecology."

They specifically discussed the need for a pelvimetry (an X ray to determine the size of the mother's pelvis in relation to the baby's head) in primi breech (a baby in feet-first position in a first-time mother who is called a primigravida), and the possibility of consultation in primi breech. Dr. Dippold replied he would base his treatment on the patient's progress and any further findings made during labor. At trial, Dr. Dippold stated that he agreed with the posted list and conceded he did not follow the guidelines.

Although Dr. Dippold did not perform a pelvimetry, he assessed as normal both Jette Carman's pelvis size and the baby's head by checking and feeling on the outside. He did not check the inlet size, but summarized from the rest of the plaintiff's normal proportions that the inlet size would also be in the normal range. (The results of a general pelvic examination by another physician for plaintiff's subsequent and second pregnancy indicated that she was within the normal limits.) The posted guidelines stated, and the plaintiff's three doctor witnesses all agreed, that a pelvimetry should be taken when a child is in the breech position. Dr. Morhaim acknowledged that a physician can make an adequate judgment upon the first pelvic examination whether the pelvis is

going to be adequate for birth through the normal birth canal, but a pelvimetry is a more accurate assessment of the area of the pelvis because there are some areas (such as the transverse diameter) that cannot be felt across by hand.

The evidence further reflected that in addition to indicating the size of the baby's head and the mother's pelvis, an X ray would show whether the baby's head was in a hyperextended position which may cause the back part of the head to be caught on the pubic bone of the mother, making the delivery very difficult. Also, an X ray would help determine whether a consultant should be called or whether a Caesarean section should be performed.

From the time of Jette Carman's entry into the hospital to the time of delivery, Dr. Dippold did not consult anyone because he felt labor was progressing normally and everything was as expected. Although he did not consider a breech position in a primigravida mother to be a complication, the three doctors who testified for the plaintiff did consider it to be a complication. They testified that a general practitioner (or doctor without full obstetrical privileges), when presented with a primigravida breech delivery, should obtain consultation with a specialist.

Dr. Dippold, who had delivered, as we have said, approximately 1,400 babies since 1954, was a licensed general practitioner, but was not a specialist in either gynecology or obstetrics. He had applied for privileges in obstetrics at Mattoon Memorial Hospital in late 1972 or early 1973 and thought all the privileges had been allowed. Not until April 1, 1975, did Dr. Dippold receive (or see) a January 29, 1973, document indicating a limitation on his privileges, including the right to perform a Caesarean section, and bearing the notation that "consultation in complicated and unusual cases will be requested." Dr. Dippold did have full privileges to deliver breech presentation babies.

According to Doctors Morhaim and Hamilton, a fetal heart beat above the normal 120 to 160 beats per minute range also calls for consultation since it may indicate fetal distress. Dr. Dippold, however, did not seek consultation when the fetal heart beat was 168, but had the mother lay on her side and had the heart tones rechecked since it was such a fringe elevation above 160.

Dr. Dippold also did not believe a Caesarean section was necessary because the delivery was progressing without any hampering or other delay. But Doctors Morhaim and Hamilton testified that a Caesarean delivery should be considered, and is frequently used, in a primigravida breech. Both Dr. Lin and Dr. Morhaim noted that medical opinion has become more liberal in its thinking on the use of Caesareans than it was traditionally. All the doctors agreed that a Caesarean section reduces the

risk of mortality (death) to the baby but increases the risk of morbidity (disease complications) for the mother.

After delivery started at 2:15 a.m., the legs and trunk of the baby emerged in a timely manner, but the aftercoming head delivery was very difficult and delayed for 10 minutes. Dr. Dippold performed the accepted Mauriceau maneuver in order to deliver the baby. By that method, the doctor places two fingers in the baby's mouth in order to lower the chin and supports the baby's body with either his forearm or with the assistance of a towel around the baby. Dr. Lin stated one should try this method, but if it doesn't work, then the doctor should use the Piper forceps. Dr. Morhaim testified that in the case of a "frank breech" presentation in a first-time mother, the forceps should be used immediately.

All three doctors agreed with two leading authorities on obstetrics, Greenhill and Freedman, that the Piper forceps should be ready for immediate use at all times. They also stated that the doctor should be familiar with, and able to use, the forceps. In the present case, the Piper forceps were not on the instrument tray in the delivery room. Dr. Dippold had never used the Piper forceps before because he had always been able to deliver babies by maneuvering the head out by following the Mauriceau procedure, but he believed he was competent to use them. He initially testified he did not consider using them on the day in question because there was not enough nursing help to consider it in a hurry. Later, he testified that he considered them but brought the head out before he ever used them. During the time the delivery was delayed, the doctor did not try to pass oxygen to the baby with a catheter, even though he was able to put his fingers in the baby's mouth.

Dr. Dippold testified he did not know why the baby's head did not properly deliver, but assumed the cervix clamped down upon the neck after the passage of the trunk. Since there was no obstruction of the pelvis, the only possibility was rigidity of the primapara pelvis, *i.e.*, the soft parts that do not give way easily and thus delay the progress or mechanics of a birth because the tissues have not been stretched by a prior birth. Dr. Morhaim testified that where the cervix closes down, the corrective procedure is to cut the cervix and push it back over the head (Duhrssen incision). He noted, however, that this is difficult to do, and Dr. Lin stated it was not a common procedure and was considered by some doctors to be obsolete.

After the baby was delivered by Dr. Dippold, breathing did not start spontaneously and resuscitation for a period of 12 to 15 minutes ensued before the baby was taken to the nursery. After attending to Mrs. Carman in the delivery room, Dr. Dippold went to the nursery, checked on the baby, and then called in Dr. S. W. Thiel for consultaton.

Although Dr. Thiel treated the baby, the infant died approximately four hours later. Dr. Thiel testified that in his opinion death was caused by an imbalance in the blood chemistry which resulted from the lack of oxygen for an extended period of time. Based on the delivery room history, he stated that the 10 minutes taken to deliver the aftercoming head resulted in the lack of oxygen. He testified that he did not observe any abnormality in the child that would lead him to believe a defect in the child other than the lack of oxygen was the cause of death. Therefore, it was his opinion that "the baby died from shock and acidosis due to anoxia irreversible cellular exchanges."

Dr. Dippold testified that it was a possibility that the cause of death was suffocation due to the cervix closing upon the neck and umbilical cord if there were no other contributory factors. He also stated that the baby did not get enough oxygen and the delay in the delivery of the head was a part of that cause, but without an autopsy (which the plaintiffs would not permit), it was impossible to know if there was any other contributory factor.

On appeal, the Carmans allege the trial court erred in denying their motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial.

I

It is first contended that Dr. Dippold's failure to seek expert consultation was negligence as a matter of law. Although a breech presentation in a primigravida and a fetal heart beat of 168 would point toward consultation, Dr. Dippold did not believe it was necessary because the labor was progressing normally. Doctors Morhaim, Hamilton, and Lin testified (and the hospital guidelines provided) that a general practitioner, or one without full obstetrical privileges, should consult a specialist when confronted with a primi breech. However, Dr. Dippold believed he did have full obstetrical privileges. Furthermore, Dr. Lin was not of the opinion that a general practitioner should *never* attempt to deliver a baby in breech position without consulting a specialist. It was also observed that consulting a specialist is no guarantee of success.

■■ To recover in a malpractice action, the plaintiff must prove by the use of expert testimony that the want of care caused the injury to the plaintiff. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) And a new trial should be granted only if the verdict is contrary to the manifest weight of the evidence. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32; *Houston v. Zimmerman* (1975), 30 Ill. App. 3d 425, 333 N.E.2d 472.) From the evidence presented here, the jury could have found that consultation was not necessary or that the failure to consult was not the

proximate cause of the death. Thus, its finding in this respect was not erroneous as a matter of law nor was it against the manifest weight of the evidence.

## II

■■ The Carmans next claim Dr. Dippold was negligent as a matter of law in failing to advise them of the situation and in failing to obtain their consent to delivery through the birth canal. It is settled that a patient's consent is a prerequisite to a surgical operation by a physician. (*Pratt v. Davis* (1905), 118 Ill. App. 161, *aff'd* (1906), 224 Ill. 300, 79 N.E. 562; *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 262 N.E.2d 156.) Here, the record shows that prior to delivery Jette Carman signed a consent to "all treatment and operations * * * which in the judgment of the attending physician may be considered necessary or advisable." To our view, delivery of a baby through the birth canal in a breech presentation in a primigravida is an operation encompassed within the scope of her written and implied consent. Moreover, an attempt to obtain her additional consent to the specific procedure contemplated by the doctor might have been imprudent since she was tense and her blood pressure had gone up. See *Hall v. United States* (W.D. La. 1955), 136 F. Supp. 187, *aff'd* (5th Cir. 1956), 234 F.2d 811 (applying Illinois law).

## III

■■ ■ Plaintiffs also maintain Dr. Dippold negligently performed the delivery. One alleged breach of Dr. Dippold's duty of care was the failure to perform a Caesarean section. In view of the extensive testimony concerning the competing considerations of morbidity and mortality, the jury's finding that the doctor's decision to deliver the baby through the birth canal was not negligent is supported by the evidence. Another alleged negligent omission was the failure to adequately determine the feasibility of a birth canal delivery. Although the hospital guidelines stated a pelvimetry should be ordered in all breech deliveries, there was testimony that an adequate, though less accurate, judgment can be made by the mother's doctor. Thus, the jury could have found the lack of a pelvimetry was not the cause of the baby's death.

■■ The guidelines of the hospital also provided that there should be no amniotomy unless the presenting part is engaged. Dr. Dippold claims the presenting part *was* engaged and the plaintiffs assert the presenting part was *not* engaged until an hour later. However, again we are unable to say the jury's verdict was overwhelmingly contrary to the evidence or against its manifest weight. *Mizowek; Houston.*

## IV

The evidence concerning the failure to use or have accessible the Piper forceps, however, weighs heavily against the defendant. The Mauriceau maneuver is an accepted procedure which seeks to accomplish the same result as the use of Piper forceps without the risk of laceration. But time is also an important consideration since once the body comes through, the umbilical cord is often pinched between the mother's pelvis and the baby's head or shoulders, thus cutting off its oxygen supply.

All the doctors testified that in the situation presented here, the Piper forceps should have been available and used if the other procedures proved unsuccessful. Dr. Lin testified that if the Mauriceau maneuver is unable to free the head, the Piper forceps should be used, while Dr. Morhaim testified that in the case of a primigravida the Piper forceps should be used immediately. Dr. Dippold presented no expert testimony in support of his continued use of the Mauriceau procedure even though ten minutes were required to free the head.

It is well settled, of course, that a party is entitled to a judgment *n.o.v.* only in those cases in which all of the evidence so overwhelmingly favors the movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) We fully recognize the distinction between a reversal for a new trial and the direction of a verdict or a judgment notwithstanding the verdict. As our supreme court was careful to point out in *Pedrick*:

> "We have rather carefully preserved the distinction between the evidentiary situation which will require a new trial, verdict against the manifest weight of the evidence (*Lau v. West Towns Bus Co.*, 16 Ill. 2d 442, 451, *cert. den.* 361 U.S. 127), and that justifying direction of a verdict or judgment *n.o.v.* There is, in our judgment, excellent reason for so differentiating to be found in the radically different results of allowance of the two motions, and we believe a more nearly conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial. It is not our intention by this opinion to alter this concept." 37 Ill. 2d 494, 509-10, 229 N.E.2d 504, 513.

The case before us is not a simple "fender-bender" or garden variety lawsuit as far as the evidence is concerned. This is not an instance of a parade of occurrence witnesses at a busy intersection relating their version of what they saw. We are dealing here with a medical malpractice case where the crux of the action funnels down to three medical experts— with no independent professional contradiction—in total accord as to the proper standard of medical care to be followed in the context of the facts here: The Piper forceps should be available for immediate use at all times;

the delivering doctor should be familiar with, and able to use, the forceps; and once the Mauriceau maneuver fails to work, the forceps should be used (Dr. Lin's and Dr. Morhaim's testimonies varied only as to *when* the Piper forceps should be resorted to). The evidence clearly reflected that the Piper forceps were not even on the instrument tray in the delivery room.

■■ Upon this evidence a verdict for the defendant on the issue of liability could never stand. The expert testimony before the jury here established a standard of care which included the availability and use of Piper forceps. And the evidence quite strongly indicates the failure to follow that standard proximately caused the baby's death. In our view, the *Pedrick* standard has been met and thus we are required to enter a judgment notwithstanding the verdict upon the issue of liability and remand for a new trial upon the issue of damages.

## V

And as to damages, plaintiffs also allege there were certain errors relating to that issue. The court struck the underlined portions of plaintiffs' pleadings which read as follows:

"A. Suffered great pain and anguish, both in mind and in body during the course of the delivery of said child.

B. That as a result of the death of said child, plaintiff suffered mental anguish and will continue to so suffer in the future."

■■■ In *Public Finance Corporation v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765, the Illinois Supreme Court set forth the four-part test for recovery for mental anguish and emotional distress.

"First, the conduct must be extreme and outrageous. * * *

Second, infliction of emotional distress alone is not sufficient to give rise to a cause of action. * * *

Third, reckless conduct which will support a cause of action under the rules stated is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. * * *

Fourth, * * * the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." (66 Ill. 2d 86, 89-90, 360 N.E.2d 765, 767.)

Clearly, the Carmans have failed to meet the test. There was no showing that Dr. Dippold was substantially certain that severe emotional distress would result from his actions. Since the plaintiffs did not establish a cause of action for the recovery of mental anguish, the court properly suppressed evidence concerning Jette Carman's distress.

## VI

Finally, the plaintiffs object to three of defendant's instructions which were based on IPI Civil No. 11.01 (2d ed. 1971) modified. The instructions (combined here) read as follows:

> "Under [Count I] [Count II] [Count III] of the complaint, when I use the expression 'contributory negligence,' I mean negligence on the part of [either DARYL LEROY CARMAN or JETTE LEE CARMAN] [the plaintiff JETTE LEE CARMAN] [the plaintiff DARYL LEROY CARMAN] that proximately contributed to cause the alleged death."

In response to plaintiffs' contention that there was no evidence of contributory negligence in the case, the trial judge stated:

> "There doesn't have to be. They have to prove themselves free from contributory negligence."

■■ Now the general rule is that there must be some evidence in the record to justify giving an instruction. (*Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624.) However, since a plaintiff in Illinois has the burden to prove himself free from contributory negligence, unless the court directs in plaintiff's favor on that issue (*e.g., Smith v. Bishop* (1965), 32 Ill. 2d 380, 205 N.E.2d 461; *Dertz v. Pasquina* (1974), 59 Ill. 2d 68, 319 N.E.2d 12), contributory negligence remains a jury question (*Mueller v. Sangamo Construction Co.* (1974), 20 Ill. App. 3d 602, 314 N.E.2d 700) that warrants an instruction. Since the plaintiffs did not move for a directed verdict on this issue, the instruction was properly given.

The other less significant issues raised by the plaintiffs fall either within the trial court's discretion or the doctrine of harmless error.

Reversed and remanded for a new trial as to damages only.

TRAPP and CRAVEN, JJ., concur.