SANDI MERLO, a Minor, by her Parents and Next Friends, Pietro Merlo and Rosa Merlo, Plaintiff-Appellant, v. FRANK PARISI, Defendant-Appellee.

First District (6th Division)    No. 1—91—4090

Opinion filed October 8, 1993.

DiMonte & Lizak, of Park Ridge, for appellant.

Lord, Bissell & Brook, of Chicago (David J. Slawkowski, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

The plaintiff, Sandi Merlo, by her parents and next friends, Pietro and Rosa Merlo, filed a medical malpractice action against defendant, Dr. Frank Parisi, alleging that he was negligent in failing to diagnose her kidney failure and in contributing to this condition through his inappropriate treatment with antibiotics. Following a trial, the jury found in favor of defendant. The issues on appeal are: (1) whether the jury's verdict was against the manifest weight of the evidence; (2) whether the trial court erred in allowing defense counsel to use plaintiff's school attendance records in the cross-examination of plaintiff's witnesses and in closing argument; (3) whether the trial court erred in refusing to allow defendant's medical records to be submitted to the

jury during its deliberations; and (4) whether the trial court erred in threatening to call a mistrial after plaintiff's mother started crying during her testimony. We affirm.

The defendant has been in family practice since 1946. Between 1976 and 1983 about 40% of his patients were children. Mrs. Parisi, a registered nurse, assisted him in the office and was in charge of the medical records and office history cards on each patient. When patients came to the office, their height, weight, blood pressure and temperature would be taken and recorded on the history card before they were seen by defendant. Dr. Parisi had been the Merlos' family physician since 1967.

The plaintiff was born on November 12, 1975, and aside from poor eating habits, she appeared to develop normally until the age of seven. During this time she saw Dr. Parisi once or twice a year for upper respiratory symptoms such as a sore throat, pharyngitis, fever, nasal congestion, and cough. At each of these visits, Dr. Parisi would examine the plaintiff's throat, ears and eyes and listen to her chest. On occasion, he would have a urinalysis performed which was always normal. Dr. Parisi treated the plaintiff's upper respiratory symptoms with penicillin or a similar antibiotic, an antihistamine or decongestant, and a cough suppressant. He did not perform a throat culture before prescribing medication because he believed it was better to assume that a fever and sore throat were bacterial and should be immediately treated with an antibiotic in order to prevent the development of a more serious condition such as strep throat or rheumatic fever. In late 1981 the plaintiff had a tonsilectomy, which was performed by another physician because defendant was on vacation.

In the fall of 1982 the plaintiff started having difficulty eating and retaining her food, and she seemed to need more sleep. On September 16, 1982, the plaintiff saw Dr. Parisi for treatment of a sore throat. She had no fever at that time but did have some wheezing in her lungs. Dr. Parisi prescribed penicillin and a cough suppressant. She was again seen by Dr. Parisi on January 27, 1983. At that time she had a temperature of 102 degrees, a sore throat, a cough, and a weight loss of 4½ pounds. The plaintiff's urinalysis was negative, and her heart and lungs appeared to be normal. Dr. Parisi concluded that she had acute pharyngitis and bronchitis, and he treated her with Pediamycin, an appetite stimulant, and medication to stop the vomiting. He also gave her an injection of another antibiotic known as Lincocin. When Dr. Parisi saw the plaintiff four days later, her fever, which had initially subsided, reoccurred, and she complained of abdominal pain and vomiting. He prescribed another antibiotic known as

Keflex and continued the appetite stimulant and the Tigan, which she was taking for the vomiting.

Dr. Parisi did not see the plaintiff again until April 1983 when she was brought to the office with her sister who was scheduled for a physical examination. During this visit the plaintiff's mother requested that the plaintiff be seen by another physician. Dr. Parisi referred the plaintiff to Dr. Akbar Rahmani, an endocrinologist. He saw the plaintiff three days later and ordered blood tests and X rays. Additional diagnostic tests were also performed on the plaintiff the following day. Dr. Rahmani then arranged to have the plaintiff evaluated by Dr. Cyrus Akrami, a kidney specialist. He advised the plaintiff's mother that the plaintiff was suffering from end-stage renal failure. The plaintiff was subsequently transferred to an intensive care unit under the care of Dr. Edward Moore, a pediatric nephrologist (physician who specializes in the treatment of children with some form of kidney pathology).

The plaintiff was initially treated with dialysis. In August 1983 a transplant was performed with a kidney donated by the plaintiff's mother. However, the kidney was rejected, and the plaintiff resumed dialysis treatments. In February 1986 the plaintiff received a second transplant, which was apparently successful. Her main complaint has been that the antirejection medication that she is required to take has caused significant weight gain.

At the trial, Dr. Moore testified that the cause of the plaintiff's kidney disease was unknown and that this was true of the majority of children who had this disease.

Dr. James Allen Schayman testified as an expert witness on plaintiff's behalf. He was an assistant professor of internal medicine and nephrology at the University of Michigan, board certified in internal medicine and a specialist in nephrology. Aside from a medical school rotation and his internship, Dr. Schayman had very little experience in family practice or the treatment of children. Two-thirds of his professional time was devoted to research at the university. It was Dr. Schayman's testimony that Dr. Parisi's treatment of the plaintiff was below the standard of care expected of a reasonably qualified family practitioner. He was most critical of Dr. Parisi's medical records, which were not as complete as they could have been and in some instances did not contain the name of the patient for whom medication had been prescribed. He also stated that Dr. Parisi should have diagnosed the plaintiff's kidney disease in September 1982 or January 1983, but he could not say whether the diagnosis of her condition at that time would have prevented the need for subsequent dialysis or

the transplants. It was also Dr. Schayman's opinion that the most likely cause of the plaintiff's renal failure was the antibiotic therapy which she received from Dr. Parisi over a five- or six-year period. Although Dr. Schayman was aware that penicillin was still used as part of her medication therapy, he stated that the steroids she was taking would suppress any adverse reaction. Dr. Schayman did acknowledge that there were many other causes of renal failure.

Dr. Richard McDonough was a board-certified family practitioner with 12 years of experience in this specialty. Although Dr. McDonough was initially retained to testify on behalf of Dr. Parisi, he was called by plaintiff's counsel to testify in her case. Dr. McDonough testified that although Dr. Parisi did not always maintain good records, his medical treatment of the plaintiff, including his use of antibiotics, was within the standard of acceptable medical practice. Dr. McDonough also stated that the standards of acceptable practice did not require a family practitioner to order throat cultures or other laboratory tests prior to prescribing antibiotics in view of the plaintiff's symptoms, which were common symptoms of a bacterial infection. Dr. Mc-Donough did not believe that the penicillin therapy caused the plaintiff's renal failure nor did he believe that any earlier diagnosis of this condition would have cured the disease or prevented the renal failure which occurred.

Dr. Richard Alan Cohn was a board-certified pediatric nephrologist who taught at Northwestern Memorial Hospital. Between 1976 and 1983 all of his practice was devoted to the treatment of children. He testified that Dr. Parisi's treatment of the plaintiff was within the standard of accepted medical practice for a general family practitioner. He reviewed the biopsy report of the plaintiff's kidney and concluded that she suffered from chronic kidney failure which resulted from inflammation and scarring over a long period of time. He added that this condition was difficult to detect, progressive and irreversible. Therefore, even if her kidney disease had been diagnosed earlier, it would not have prevented the subsequent dialysis and transplant which she required. Furthermore, it was his opinion that the plaintiff's kidney disease was not caused by penicillin or any other antibiotic medication that she had taken. He then stated that the type of kidney disease which was caused by antibiotics presented a different clinical picture of an acute attack accompanied by a skin rash, urine reduction and other reactions not present in the plaintiff's case.

Plaintiff first contends that the jury verdict was against the manifest weight of the evidence because Dr. Parisi violated the standard of care through his inadequate medical record keeping, his excessive use

of antibiotics, and his failure to diagnose the plaintiff's illness. The issue of whether a physician has violated the standard of acceptable medical practice is a question of fact for the jury to resolve. (*Collins v. Roseland Community Hospital* (1991), 219 Ill. App. 3d 766, 777, 579 N.E.2d 1105.) A jury verdict can only be reversed by a court of review if it is contrary to the manifest weight of the evidence. (*Heuer v. Goldberg* (1969), 106 Ill. App. 2d 55, 61, 245 N.E.2d 497.) The jury verdict is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or where the verdict appears to be arbitrary and unsubstantiated by the evidence. *Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383.

■■ The plaintiff first argues that Dr. Parisi's failure to keep adequate medical records violated the standard of acceptable medical practice because it was difficult to determine the number of times the plaintiff was seen by Dr. Parisi, what his findings were when he examined her, as well as the frequency with which Mrs. Merlo contacted Dr. Parisi by telephone regarding the plaintiff's complaints. Although Dr. Parisi's records indicated that he saw the plaintiff on September 16, 1982, and again on January 27, 1983, the debit records indicated that there were eight other occasions in which a member of the Merlo family was seen. In addition, the medication record indicated that during this same period, medication was prescribed for one of the members of the Merlo family, but there were no entries reflecting this in any of the history notes.

Although the plaintiff's expert, Dr. Schayman, testified that Dr. Parisi's medical documentation violated the standard of care, Dr. Parisi's expert, Dr. Cohn, stated that records did not treat patients and that "Dr. Parisi knew this family well and his records are what they are." In addition, plaintiff's expert acknowledged that there was no indication that the claimant's treatment would have been different had Dr. Parisi kept more complete records.

■ The plaintiff also argues that Dr. Parisi violated the standard of care by not performing throat cultures or other laboratory tests before prescribing antibiotics and that his inappropriate use of antibiotics caused the plaintiff's kidney disease. Dr. Schayman testified that Dr. Parisi should have evaluated the basis for the plaintiff's multiple sore throats and other symptoms through a complete physical examination or laboratory data before initiating antibiotic therapy. However, Dr. McDonough testified that given the plaintiff's symptoms, Dr. Parisi's failure to perform a throat culture or other laboratory tests before prescribing antibiotics did not violate the standard of care. He further testified that he did not believe that treatment with penicillin

caused the plaintiff's kidney failure or that any earlier diagnosis of her condition would have changed the outcome of her illness. Dr. Cohn also testified that Dr. Parisi's treatment of the plaintiff adhered to the standard of acceptable medical practice. Based on his review of the biopsy report of the plaintiff's kidneys, he stated that she suffered from chronic kidney failure due to inflammation and scarring which had developed over a long period of time and which was progressive, irreversible and difficult to detect. He was also of the opinion that earlier diagnosis of the plaintiff's condition would not have prevented her need for dialysis or the transplant, and her condition was not caused by penicillin or other antibiotics. He stated that kidney disease which is medication induced presents a different clinical picture of acute onset, skin rash, urine reduction or other symptoms not present in this case.

The evidence presented by both parties is at best conflicting, and, contrary to the plaintiff's assertion, a determination opposite to that of the jury is not clearly apparent. Accordingly, the jury's verdict was not against the manifest weight of the evidence.

■ The plaintiff next contends that it was error to allow the defendant to use the plaintiff's school attendance records to cross-examine plaintiff's witnesses and in his closing argument because the records were not authenticated or admitted into evidence. The plaintiff's school attendance records were first used by defense counsel during his cross-examination of Rosa Merlo. Defense counsel asked Merlo how often the plaintiff had been too sick to attend school during the months of October and November 1982. When Merlo responded that she did not remember, defense counsel handed her a copy of the plaintiff's school attendance record and asked her to review it to see if it refreshed her recollection. After Merlo stated that she did not understand the document and that it did not help her remember when the plaintiff was absent, defense counsel did not make any further reference to the record.

Plaintiff argues that the use of school records in the cross-examination of Rosa Merlo was improper because it brought before the jury the contents of a document which had not been authenticated or admitted into evidence. (See *Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 452 N.E.2d 558, and *Anderson v. Universal Delta* (1967), 90 Ill. App. 2d 105, 234 N.E.2d 21, which plaintiff cites as supporting authority.) However, the contents of plaintiff's school attendance records were not revealed to the jury during counsel's cross-examination of Rosa Merlo but were used for the sole purpose of attempting to refresh her recollection as to the number of days the plaintiff was ab-

sent from school because of her illness. Counsel may attempt to refresh a witness' recollection through reference to written instruments or memoranda prepared by a third person or even intangible objects. (*In re Thomas* (1978), 65 Ill. App. 3d 136, 138, 382 N.E.2d 556.) Because there was no requirement that the documents be authenticated or admitted into evidence, their use during Rosa Merlo's cross-examination was not improper.

The plaintiff's attendance records were again used during defense counsel's cross-examination of Dr. Schayman. However, in this instance the contents of the school records were brought before the jury when defense counsel asked Dr. Schayman to read from the record as follows:

"Q. Can you tell from that record how many days of school Sandy [*sic*] Merlo missed in the first quarter of that school year?

A. She was gone two days.

Q. Can you tell from the record how many days of school Sandy [*sic*] Merlo missed in the second quarter of that school year?

A. Two days.

Q. Can you tell what two days those were, Doctor?

A. I believe there is a key there that explains it. It looks like the 20th of December. I don't see the second day based on this. You would have to point it out to me.

Q. Can you determine from that record, Doctor, how many days from school she missed in the third quarter?

A. Nine days.

Q. Can you tell from that record, Doctor, when those days were?

A. This looks like January 27th almost continuously February 11."

Defense counsel continued with this line of questioning for March and April of 1983. Assuming, *arguendo*, that it was error to allow defense counsel to have Dr. Schayman read from the unauthenticated document, the plaintiff's attendance record was not directly related to the quality of care Dr. Parisi provided. Therefore, the fact that the contents of the document were brought before the jury did not result in any prejudice to the plaintiff and did not affect the outcome of the trial. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 243, 529 N.E.2d 525.) More importantly, Dr. Schayman testified during cross-examination that the information from the plaintiff's attend-

ance record did not change his opinion regarding Dr. Parisi's standard of care.

Plaintiff further argues that it was reversible error for defense counsel to refer to the unauthenticated school records in closing argument. In determining whether a party has been denied a fair trial by counsel's argument before the jury, the proper character and scope of such argument is largely left to the discretion of the trial court, and absent an abuse of discretion, its ruling should not be disturbed. (*Lawing v. Chicago Transit Authority* (1986), 142 Ill. App. 3d 119, 126, 491 N.E.2d 145.) Furthermore, a reviewing court must consider the trial as a whole in determining whether a party's rights have been substantially prejudiced by opposing counsel's arguments to the jury. *Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 161, 349 N.E.2d 578.

During closing argument defense counsel again referred to the unauthenticated school records and argued that plaintiff's infrequent absences six months prior to the discovery of her kidney failure contradicted the testimony of plaintiff's witnesses as to the severity of her symptoms during this period.

We first note that plaintiff has waived this argument where plaintiff's counsel failed to object at the trial or raise the issue in his posttrial motion. *Carlasare v. Wilhelmi* (1985), 134 Ill. App. 3d 1, 5, 479 N.E.2d 1073; *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 769, 347 N.E.2d 320.

Moreover, although defense counsel tried to use the attendance records to attack the credibility of plaintiff's witnesses, the jury had an opportunity to observe the witnesses' testimony and evaluate the evidence presented. The jury also heard plaintiff's expert testify that the attendance record did not change his opinion that Dr. Parisi violated the standard of care. Therefore, we conclude that defense counsel's reference to the records in closing argument was not prejudicial to plaintiff.

■ Plaintiff next contends that it was error for the trial court to refuse to allow defendant's medical records to be submitted to the jury. Section 2—1107 of the Code of Civil Procedure provides that documents read or received into evidence may be taken by the jury during their deliberations. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1107(d).) However, the decision of whether to send exhibits to the jury room rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. (*Fultz v. Peart* (1986), 144 Ill. App. 3d 364, 379, 494 N.E.2d 212.) In *Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 556, 356 N.E.2d 779, the court stated that

where exhibits contain considerable material irrelevant to the issues of the case, the preferred procedure is to have the parts which are relevant read to the jury.

In the case *sub judice*, Dr. Parisi's records consisted of 18 pages containing detailed histories, prescriptions, billing and payment information. Many of the entries were irrelevant to plaintiff's case because they pertained to Dr. Parisi's treatment of the other two Merlo children. The portions of the records which plaintiff believed supported her case were blown up and continuously exhibited to the jury. All the relevant portions of the record were referred to during Dr. Parisi's testimony, direct and cross-examination of the expert witnesses and in closing arguments.

Plaintiff argues that the trial court abused its discretion in refusing to allow the medical records to be submitted to the jury because there was extensive testimony throughout the trial pertaining to entries by Dr. Parisi over a seven-year period, the jury was not permitted to take notes and the medical testimony was highly complex. Thus, the records were important to the jury to help it understand Dr. Parisi's medical treatment and refresh its recollection of the testimony at trial. Plaintiff concludes that because the jury requested the records on two separate occasions and believed they would be helpful, it was error to refuse its request.

In *Fultz v. Peart*, which is factually similar to the case *sub judice*, the trial court also refused the jury's request to take hospital records into the jury room. The appellate court stated that the records contained extensive medical information beyond the average juror's understanding as well as irrelevant information which might have improperly influenced the jury. Throughout the trial witnesses for both parties were allowed to refer to and read parts of the record, and both counsel were allowed to refer to the record in their closing arguments. The court in that case concluded that there was no abuse of discretion in not allowing the records to be taken to the jury room. (*Fultz*, 144 Ill. App. 3d at 380.) Likewise, in the instant case, we also conclude that the trial court did not abuse its discretion in refusing to allow Dr. Parisi's records to be submitted to the jury during its deliberations.

■ Plaintiff's final contention is that the trial court erred in threatening to call a mistrial when Rosa Merlo began to cry during her testimony. When Rosa Merlo started to cry a recess was called. Outside the presence of the jury, the trial judge stated that he would have to call a mistrial if there was another outburst. The trial resumed and Rosa Merlo completed her testimony.

The trial court is in the best position to evaluate the plaintiff's conduct and its effect upon the jury, and, absent an abuse of discretion, its decision will not be disturbed. (*Jae Boon Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 466, 605 N.E.2d 493; *Nowakowski*, 39 Ill. App. 3d at 159.) In the case *sub judice*, the trial court called a recess and warned the plaintiff against further emotional outbursts in order to avoid any potential effect upon the jury as well as a possible mistrial. When the plaintiff resumed her testimony, the trial court, in deference to her emotional state, allowed plaintiff's counsel to use leading questions. Therefore, we find no evidence that the plaintiff was prejudiced by the trial court's comments, and there was no abuse of discretion.

We also note that plaintiff's argument and supporting authority is misplaced where it is based on the issue whether the declaration of a mistrial following a witness' emotional outburst was proper, unlike the case *sub judice* where no mistrial was ever declared.

Accordingly, the judgment of the circuit court in defendant's favor is affirmed.

Affirmed.

McNAMARA, P.J., and GIANNIS, J., concur.