LA SALLE NATIONAL TRUST, N.A., as Guardian of the Estate of Sameer Parekh, a Minor, Plaintiff-Appellant, v. SWEDISH COVENANT HOSPITAL *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—92—3307

Opinion filed June 13, 1995.—Rehearing denied July 20, 1995.

Lucy & Suhar (Richard H. Lucy, of counsel), and David A. Novoselsky & Associates (David A. Novoselsky and Margarita T. Kulys, of counsel), both of Chicago, and Zamparo & Goldstein, P.C., of Northbrook (Roger Zamparo, Jr., of counsel), for appellant.

Hinshaw & Culbertson, of Chicago (John G. Langhenry, Stephen R. Swofford, and Robert E. Nora, of counsel), for appellee Swedish Covenant Hospital.

Pretzel & Stouffer, Chartered, of Chicago (Paul L. Price, Robert Marc Chemers, and Anne Scheitlin Johnson, of counsel), for appellees Roger Thorpe, Vernon Dennis, and Dennis & Associates, M.D., S.C.

Cassiday, Schade & Gloor, of Chicago (Joseph A. Giannelli and Morgan A. Milne, of counsel), for appellee Roberto Espinosa.

JUSTICE McCORMICK delivered the opinion of the court:

Plaintiff, La Salle National Trust, N.A. (La Salle), appeals a jury verdict in favor of defendants in this medical negligence action. Plaintiff had alleged that defendants' negligence in the delivery and

initial care of Sameer Parekh caused severe neurological damage and blindness. On appeal, plaintiff asserts numerous trial errors.[1] We affirm.

In 1982, hospitals in the Chicago area which administered neonatal and perinatal care had been accorded designations indicating the level of care they could provide. Level 1 hospitals provide only normal obstetrical care and normal deliveries of babies. Level 2 hospitals provide care for high-risk pregnancies and deliveries, as well as immediate care, up to 24 hours, in deliveries involving complications typically associated with premature babies. Level 3 hospitals, or tertiary care centers, provide a full range of services to all pregnant woman, including long-term care for premature infants. Levels 1 and 2 hospitals affiliate themselves with a tertiary care center to which they can transfer patients that they are not equipped to handle. In 1982, defendant Swedish Covenant was a Level 2 hospital affiliated with Rush-Presbyterian-St. Luke's Hospital (Rush), to which it referred high-risk obstetrical and neonatal cases.

According to Swedish Covenant's "maternity service plan" (the Plan), required by State licensing laws to be filed with the Chicago Department of Public Health and with the Illinois Department of Public Health, admittees experiencing high-risk pregnancies, including extreme prematurity, were to be transferred to Rush. Transfers were initiated by the obstetrician in charge of the patient based upon considerations of obstetrical complications, neonatal considerations, and hospital capability. The Plan required transfer of babies born at less than 30 weeks gestation and a birth weight under 1,500 grams. The Plan also provided guidelines as to the treatment of newborns.

Norman Olsen, M.D., who was the chairman of the obstetrical department at Swedish Covenant in March 1982, believed that the Plan established guidelines, rather than hard and fast rules. In addition to the Plan, Swedish Covenant adhered to an unwritten policy called "compassionate care" which it applied in the case of extremely premature births, those under 26 weeks gestation. In those cases, because the chance of survival approached zero, the hospital did not transfer a newborn to Rush immediately. Rather, as compassionate care, the newborn was administered supplemental oxygen and observed to determine if the baby would survive at all. The

---

[1]To comply with the appellate court page limitations specified by revised Supreme Court Rule 23 (Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994), portions of this decision have been deleted for purposes of publication. The entire decision is contained in the opinion filed with the clerk of this court.

administration of compassionate care was left to the judgment of the doctors involved.

In March 1982, defendant Dennis & Associates, M.D., S.C., was operated by defendant Vernon Dennis, M.D. Defendant Roger Thorpe, M.D., was an employee of Dennis & Associates. On December 7, 1981, Mrs. Tasvira Parekh visited the office of Dennis & Associates because she was pregnant. Dr. Thorpe took a history from Mrs. Parekh, concluded that she had conceived shortly after October 6, 1981, and estimated her due date as July 13, 1982. Dr. Dennis also examined Mrs. Parekh and concluded, consistent with Dr. Thorpe's determination, that she was nine weeks pregnant.

On March 25, between 9 and 10 p.m., during her twenty-fifth week of pregnancy (normal term is between 38 and 42 weeks), Mrs. Parekh began leaking amniotic fluid, indicating that she had suffered a premature rupture of the amniotic sac. She was admitted to Swedish Covenant, where Dr. Dennis was on staff. Dr. Olsen examined Mrs. Parekh and determined that she was not in active labor. Dr. Dennis was informed of Mrs. Parekh's status, and he ordered the standard treatment in such cases, which is bed rest and observation. Premature ruptures can result in premature labor and delivery. Because Mrs. Parekh's fetus was under 26 weeks in gestation, Dr. Dennis considered it previable, having little or no chance of surviving if born. Dr. Dennis' goal was to prolong Mrs. Parekh's pregnancy to viability, if possible. He told Mr. and Mrs. Parekh that if the baby was born at that time, he did not expect it to live. Dr. Dennis did not transport Mrs. Parekh to Rush pursuant to Swedish Covenant's Plan because he did not consider the fetus viable.

Dr. Dennis saw Mrs. Parekh on March 27. She had stabilized, although the rupture had not sealed. Because of her improved condition, Dr. Dennis had her transferred to a regular hospital room on the maternity floor.

On the night of March 29, Dr. Thorpe was on call for Dennis & Associates at Swedish Covenant. Nurse Ruth Ann Martin discovered that Mrs. Parekh had gone into labor. Nurse Martin informed Dr. Thorpe of Mrs. Parekh's labor, and he went to examine her. Dr. Thorpe knew that Mrs. Parekh was in the hospital with an extremely premature rupture. Based upon his examination, he confirmed that the gestational age of the fetus was 23 to 25 weeks. Dr. Thorpe consulted with Dr. Dennis, and they agreed that the fetus was previable, and, therefore, Dr. Thorpe did not have Mrs. Parekh transferred to Rush.

At 11:55 p.m., Dr. Thorpe ordered that an intravenous (IV) hydration solution be given to Mrs. Parekh in the hope that it would halt

the labor. At around midnight on March 30, Dr. Thorpe ordered Nurse Martin to attach a fetal monitor to Mrs. Parekh, which shows the intervals of contractions and fetal heart rate. Dr. Thorpe examined the fetal monitor strips at various times. He did not record his readings on Mrs. Parekh's chart because he did not notice signs of fetal distress on the strips.

At approximately 1:30 a.m., Mrs. Parekh felt a hard contraction. She told her husband to get the doctor. Mr. Parekh got Nurse Martin, who arrived and saw that the baby was about to be born. She rushed to get Dr. Thorpe, while Nurse Kruse prepared the nursery for the baby. Following Dr. Thorpe's orders, Nurse Kruse did not request the presence of a pediatrician in the nursery. Dr. Thorpe had not requested a pediatrician because he did not expect the baby to survive.

When Dr. Thorpe arrived, he saw Sameer lying, not moving, between Mrs. Parekh's legs. The baby's birth was recorded at 1:45 a.m. Dr. Thorpe considered his primary responsibility to be to clear an airway for Sameer because he was cyanotic and depressed, *i.e.*, in need of oxygen. As he touched Sameer, Sameer gasped, indicating a live birth. He suctioned Sameer's nose and mouth, and Sameer began breathing on his own. Because Sameer was breathing, Dr. Thorpe did not intubate him for artificial breathing. Dr. Thorpe cut Sameer's umbilical cord, dried him, wrapped him in towels, and gave him to a nurse to be taken to the nursery. Dr. Thorpe recorded Sameer's birth weight at 680 grams, normal for a baby of 25 weeks gestation. Dr. Thorpe performed an "Apgar" assessment on Sameer. Sameer's score indicated he was suffering from asphyxia. Dr. Thorpe issued no particular instructions as to care for Sameer, except that he was to be placed in a warm environment for observation to see if he responded positively.

Sameer was admitted to the nursery at 1:58 a.m., in poor condition, gasping for air and cyanotic, grayish-blue in color, indicating a lack of oxygen. He was placed immediately into an isolette, which is an enclosed bassinet that has both a warmer and an enriched-oxygen delivery system in it. Premature babies lose heat quickly, so the isolette helps stabilize temperature. Nurse Kruse, without any instructions from a doctor, but in accordance with hospital protocol, started 32% oxygen in the isolette. Room air contains 21% oxygen. Oxygen below 40% is not considered therapeutic, and a nurse cannot give therapeutic oxygen without a physician's order. Nurse Kruse monitored Sameer, taking his temperature, suctioning him, and checking his pulse, respiration and heartbeat. His pulse was strong, and he was breathing spontaneously, although his respirations were

depressed at 24 per minute and he was grunting, attempting to draw more air into his lungs.

By 2 a.m., Sameer's condition had improved somewhat. His color was good (pinkish), his heart rate was normal at 140, and his respirations had increased to a near normal 40 per minute. However, he was hypothermic, his temperature hovering at 94 degrees, despite the fact that the crib temperature was 97 degrees. A normal newborn's temperature is around 99 degrees. The nurses observed Sameer every 15 minutes over the next $1\frac{1}{2}$ hours. During that time, his heart rate remained normal, but his pulse grew weaker. His breathing became labored. He retracted and grunted, attempting to draw more air into his lungs. His color deteriorated to ruddy (reddish), indicating his difficulty in breathing. His temperature had never risen higher than 94.8 degrees.

Dr. Thorpe checked on Sameer at 2:40 a.m. At that time, he was still on 32% oxygen. Dr. Thorpe believed that Sameer's condition had improved slightly, so he called defendant Roberto Espinosa, M.D., a pediatrician, who was chairman of the pediatric department at Swedish Covenant. Dr. Thorpe informed Dr. Espinosa of Sameer's extreme prematurity and generally poor condition. At the time he called Dr. Espinosa, Dr. Thorpe believed the baby had a chance to survive, despite its poor condition.

Dr. Espinosa arrived at Swedish Covenant between 3 and 3:30 a.m. He gave Sameer a complete examination, determining Sameer's gestational age to be about 24 to 25 weeks. Dr. Espinosa found Sameer to be in a very poor condition, with heart tones so faint he could barely hear them. Sameer's color was ruddy and he was grunting and retracting while attempting to breathe. He was also attempting to cry. Dr. Espinosa believed Sameer was dying. For this reason, Dr. Espinosa did not ventilate Sameer with 100% oxygen. Hospital protocol did not require ventilation under the circumstances.

Dr. Espinosa subsequently consulted with Dr. Rinaldi at Rush. Dr. Rinaldi told Dr. Espinosa that if the baby stabilized, he should be transferred. Dr. Rinaldi recommended that the supplemental oxygen be continued, but that no further measures were warranted. He agreed that Sameer's chances of surviving were poor. Dr. Espinosa felt that supplemental oxygen had not improved Sameer's condition. In fact, Dr. Espinosa believed that Sameer's condition had worsened. Therefore, at 3:30 a.m., he decided to disconnect the supplemental oxygen to observe whether Sameer would survive or die in a neutral environment.

By 4 a.m., Sameer's respiration rate was above normal and his color was dusky, indicating a continued lack of oxygen. Sameer's

temperature remained well below normal at 93 degrees, although the isolette was still at 97 degrees. Sameer's condition remained this way until 7 a.m., when Dr. Espinosa examined him again. At 7 a.m., Dr. Espinosa found Sameer to have a heart rate between 120 and 136; respirations between 48 and 52, both within the normal range. Sameer was still retracting, struggling to breathe, and he was still hypoxic with a dusky color. Because, in Dr. Espinosa's opinion, Sameer's condition had not changed, he did not alter Sameer's treatment. Dr. Espinosa still believed that Sameer was going to die.

At 9 a.m., Dr. Espinosa reexamined Sameer. His heart tones and his respiration had improved. He was still dusky and retracting, but he was no longer gasping. Dr. Espinosa began to suspect that Sameer might survive. Therefore, he placed Sameer in 100% oxygen and called Rush for consultation and about transferring the baby. Pursuant to a consultation with Dr. Meyer, a neonatologist at Rush, Dr. Espinosa administered IV fluids to Sameer to address low blood sugar. Preparations for transfer began at 9:30 a.m. When Sameer arrived at Rush, the attending doctor estimated Sameer's gestational age at 25 to 26 weeks. Later, a nurse at Rush assessed Sameer's gestational age at 27 weeks, using an evaluation called the "Ballard Scale." However, according to plaintiff's experts, the Ballard Scale often overestimates gestational age by up to two to three weeks in cases of extreme prematurity, *i.e.*, less than 26 weeks and, according to defendants' experts, the Ballard Scale should not be used in pregnancies under 26 weeks.

Sameer survived; however, he is blind and severely mentally handicapped. Plaintiff filed this medical negligence action as Sameer's legally appointed guardian. Plaintiff's fourth amended complaint alleged numerous acts of negligence by defendants, any or all of which either caused Sameer's conditions or exacerbated conditions initially caused by his extreme prematurity.

At trial, Drs. John Gianopolous, Barry Pressman and Patricia Ellison were among plaintiff's expert witnesses. Dr. Gianopolous, a board-certified obstetrician and gynecologist with a practice in high-risk pregnancies, testified that defendants improperly cared for Mrs. Parekh when she came to the hospital, mishandled her delivery, and repeatedly failed to transport her to Rush when they should have done so, either prior to or immediately after Sameer's birth. Dr. Gianopolous believed that Sameer was suffering from *in utero* hypoxia and that his blindness and retardation could have been caused by this. According to Dr. Gianopolous, Nurse Martin, who was monitoring Mrs. Parekh, should have noted this condition on the fetal monitor and notified a physician. He also believed that Nurse Martin

should have performed a vaginal examination on Mrs. Parekh to determine her advanced stage of labor just prior to Sameer's birth. If she had done so, she would have become aware of the necessity of transferring Mrs. Parekh to a delivery room and thus lessened the level of morbidity to Sameer.

Dr. Gianopolous stated that at birth, Sameer was cyanotic, with a 40-beat-per-minute heart rate and a weight of 680 grams. These readings gave him a 30% chance of survival. Dr. Gianopolous asserted that Dr. Thorpe should have called a pediatrician to care for Sameer immediately after birth. Dr. Gianopolous further asserted that because Sameer's vital signs were good after he had received 32% oxygen, Dr. Espinosa should not have discontinued that oxygen at 3:30 a.m. He testified that the actions of Dr. Espinosa increased the level of morbidity suffered by Sameer. However, Dr. Gianopolous conceded that even if everything he suggested had been done by defendants, Sameer may have suffered the same level of dysfunction as he currently does.

Dr. Pressman, a diagnostic radiologist, reviewed magnetic resonance imaging (MRI) films of Sameer's brain. He testified that Sameer's brain was abnormal in that he had a loss of brain substance. The MRI indicated that Sameer had suffered from hypoxia ischemia (a lack of oxygen) during the 24- to 27-week gestational period. Based on the MRI, Dr. Pressman did not believe that Sameer's abnormality was hereditary. He also did not believe that prematurity alone could have caused Sameer's abnormality absent additional injury, such as hypoxia ischemia. However, he expressed no opinion as to the cause of the hypoxia ischemia or whether the hypoxia caused Sameer's retardation.

Dr. Ellison, a board-certified pediatric neurologist, testified that she examined Sameer in 1989 and found him to be completely blind and permanently and "profoundly retarded." Sameer has an IQ of approximately 15 to 20, which will not improve significantly. He does not speak and cannot use language, nor does he respond to language. Sameer has good motor skills and he does not suffer from cerebral palsy.

According to Dr. Ellison, pursuant to Swedish Covenant's Plan, Dr. Dennis should have transferred Mrs. Parekh to Rush at the time she was admitted to Swedish Covenant because Swedish Covenant did not have the equipment or the expertise to deal with a baby of Sameer's small size. She conceded, however, that even had Sameer been born at Rush, he may have suffered the same morbidity as he did. Dr. Ellison did not believe the Plan established mere guidelines; rather, physicians and nurses had no discretion under the Plan as to

whether to transfer certain babies. The Plan provided that infants of a gestational age under 30 weeks and a weight under 1,500 grams must be transferred to Rush.

Dr. Ellison also stated that Sameer also should have been intubated and given 100% oxygen at birth. Notwithstanding that at 2:15 a.m. on March 30 Sameer showed signs of respiratory distress, he should have been transported to Rush shortly after the supplemental 32% oxygen he had been given had stabilized him. Dr. Ellison further testified that Dr. Espinosa should not have discontinued Sameer's oxygen at 3:30 a.m. because the baby was in good health prior to discontinuation. According to Dr. Ellison, the lack of oxygen damaged Sameer's eyes. She explained that lack of oxygen in newborns can cause retrolental fibroplasia (RLF), which is the proliferation of little blood vessels and scar tissue in the back of the eye. Sameer suffered from RLF. Dr. Ellison conceded, however, that RLF occurs in the best of treatment circumstances when extremely premature babies are involved.

Dr. Ellison further testified that by 10 a.m. Sameer also showed signs of hypoglycemia, or glucose deprivation. This hypoglycemia, in conjunction with the hypoxia he had been suffering, caused damage to Sameer's brain. Dr. Ellison believed that the resuscitation undertaken by Dr. Espinosa at 9:30 a.m. should have been conducted at 2 a.m. because Sameer was not hypoxic between 2 and 3:30 a.m. while he was receiving 32% oxygen. Dr. Ellison believed that had Sameer been treated properly from the time Mrs. Parekh entered Swedish Covenant, he would be only mildly retarded, with an IQ between 50 and 70, and he would be functional in society.

Defendants called numerous experts, all of whom stated that Sameer's conditions are attributable entirely to his extreme prematurity. These experts further agreed that the defendant doctors made judgment calls within the standard of care and thus did not cause or exacerbate Sameer's conditions. In particular, Dr. Dale Phelps, a board-certified pediatrician, and Dr. Thomas Gardner, another pediatrician, testified that in 1982 the standard of care for a baby with a gestational age and birth weight such as Sameer's required only "comfort care" by providing warmth and relieving pain. These infants had no expectation of survival. Dr. David Stumpf, an expert in pediatrics and neurology, testified similarly and stated that Sameer had had less than a 1% chance of survival. Dr. Russell Snyder, a pediatric neurologist, attributed Sameer's mental retardation to prematurity in that Sameer's brain was not fully developed at birth. Dr. William Meadow, a pediatrician board certified in neonatology at the University of Chicago, testified that Sameer's prospects of

survival were "dismal" at 3:30 a.m. when Dr. Espinosa discontinued his oxygen. Prior to 1982, Dr. Meadow had never known of a newborn of Sameer's birth weight to survive. Thus, the discontinuation of oxygen was within the standard of care.

Finally, the trial court permitted defendants to call Dr. Stephen Coker as a treating physician. Dr. Coker, a pediatric neurologist, examined Sameer in September 1987.

Dr. Coker stated that Sameer's mental retardation was of obscure etiology, but probably had been caused as a result of a prenatal condition or, less likely, of a genetic problem, in the formation of his brain. He also believed that Sameer's blindness was due to prematurity.

The jury returned a verdict in favor of all defendants and answered special interrogatories finding that each defendant had not acted negligently. These interrogatories instructed the jury that if it did not find the defendants professionally negligent, it was not to determine whether the defendants caused Sameer's injuries. This appeal followed.

Plaintiff's first claim is that the trial court erred in barring it from presenting Dr. Gianopolous' testimony that Dr. Espinosa's withdrawal of supplemental oxygen from Sameer without obtaining the consent of Sameer's parents was a violation of the standard of care. Plaintiff also claims error by the court in barring Dr. Gianopolous from testifying that the supplemental oxygen being administered to Sameer was a "life support" which could not be removed without a court proceeding. The trial court ruled that cases, beginning with *In re Estate of Longeway* (1989), 133 Ill. 2d 33, 549 N.E.2d 292, addressing the termination of life support were inapplicable in this case because Dr. Espinosa had merely reduced the amount of oxygen.

We agree with the trial court's assessment of the *Longeway* line of cases. *Longeway* and its progeny, *e.g., In re C.A.* (1992), 236 Ill. App. 3d 594, 603 N.E.2d 1171, *appeal denied* (1993), 148 Ill. 2d 642, 610 N.E.2d 1264, concerned petitions brought seeking court orders permitting the removal of terminally ill patients from life support systems, such as respirators, which merely prolong the act of dying. Indeed, they have little bearing on this litigation, in which a newborn, who could breathe on his own, albeit with difficulty, was placed into an oxygen-enriched environment to make breathing easier.

■ Nonetheless, plaintiff asserted for the first time during oral argument before this court that Dr. Gianopolous would have testified that the supplemental oxygen administered in this case, although not life support when it was begun, became a form of life support as the first hours of Sameer's life passed. However, this contention is simply unsupported by the offer of proof made at trial.

We next address plaintiff's claim that the trial court should have allowed Dr. Gianopolous to testify that Dr. Espinosa had to obtain informed consent before removing Sameer's supplemental oxygen. Defendants contend, as they did at trial, that the withdrawal of supplemental oxygen was merely a change in treatment which did not require consent in addition to that already received from Mrs. Parekh.

■ This court will not disturb a trial court's decision excluding evidence absent a clear abuse of discretion. (*Gill v. Foster* (1993), 157 Ill. 2d 304, 626 N.E.2d 190.) We are faced with a significant problem in addressing this issue because the informed consent which plaintiff concedes Mrs. Parekh signed is not in the record before us. Thus, we are unable to consider if a factual issue exists as to whether Dr. Espinosa's action exceeded his original authority under that document. Indeed, the court has no way of knowing to what extent Mrs. Parekh consented to medical decisions for Sameer's initial care. *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 426, 379 N.E.2d 1365, illustrates the importance of making the release form part of the record in this case. In *Carman*, a pregnant woman had signed a release form permitting the defendant to perform " 'all treatment and operations *** which in the judgment of the attending physician may be considered necessary or advisable.' " (*Carman*, 63 Ill. App. 3d at 426.) The court found that a certain obstetrical procedure performed and alleged to have exceeded the scope of the consent was within the quoted terminology. Here, if Mrs. Parekh signed a like document, Dr. Espinosa would have had wide latitude in treatment. Given the absence of Mrs. Parekh's consent form from the record, we cannot conclude that the trial court's exclusion of this portion of Dr. Gianopolous's testimony was an abuse of discretion, particularly in light of plaintiff's presentation of this issue to the trial court as one involving a *Longeway* termination-of-life-support question. If plaintiff wanted to challenge informed consent, plaintiff should have offered the consent form as proof that such an issue existed. Accordingly, we must conclude that the trial court properly determined that defendants did not violate the standard of care by withdrawing the supplemental oxygen administered to Sameer.

Plaintiff next contends that the trial court committed reversible error in refusing its tendered instruction defining proximate cause. Plaintiff submitted the long form of Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971) (IPI Civil 2d No. 15.01), which states:

"When I use the expression 'proximate cause', I mean any cause which, in natural or probable sequence, produced the injury

complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]"

Pursuant to defendants' objection, the trial court struck the bracketed portion of the instruction. Plaintiff claims that this prohibited the jury from concluding that Sameer's prematurity could have been a concurrent cause of his disability which defendants aggravated by their negligence. Defendants contend that this issue is rendered moot by the jury's answers to the special interrogatories propounded by the trial court because the jury did not reach the question of proximate cause.

Plaintiff cites *Lewis v. W.F. Smith & Co.* (1979), 71 Ill. App. 3d 1032, 1037, 390 N.E.2d 39, for the proposition that when a party appeals on the ground of trial error, rather than manifest weight of the evidence, the jury's answers to special interrogatories do not limit this court's consideration of issues rendered moot by those answers. Plaintiff misinterprets the holding in *Lewis*. In *Lewis*, the defendant appealed a judgment without challenging by post-trial motion the jury's answers to special interrogatories. The plaintiff argued that this failure waived all issues on appeal. The *Lewis* court held that a party's failure to challenge special interrogatories is only a waiver of the issues on appeal when the appealing party challenges only the manifest weight of the evidence. See *Huff v. Illinois Central R.R. Co.* (1972), 4 Ill. App. 3d 113, 116-17, 280 N.E.2d 256 (when a jury answers special interrogatories, in order to preserve a challenge to the weight of the evidence, a party must assert that the answers to interrogatories were unsupported by evidence).

■ *Lewis* is inapposite here because defendants are not arguing that plaintiff has waived any issue. Rather they argue that because the jury's answers to the special interrogatories indicated that its verdict was grounded upon a finding of nonnegligent conduct by the defendants, any error in the proximate cause instruction is moot. Defendants are correct. Any error in the jury instruction on proximate cause could in no way have prejudiced plaintiff because the jury did not base its verdict upon the issue of proximate cause, but rather, upon its finding that defendants did not breach the standards of care.

Plaintiff further contends that the trial court committed reversible error by excluding evidence of defendants' failure to chart various information during their visits to Mrs. Parekh. As plaintiff notes, the trial judge had initially granted a defense motion *in limine* prohibiting plaintiff from questioning Dr. Gianopolous about then de-

fendant Dr. Olsen's failure to chart his initial examination of Mrs. Parekh upon her admission to Swedish Covenant. Plaintiff concedes that Dr. Gianopolous could not state that this failure caused any injury to Sameer. Thus, plaintiff has no quarrel with the trial court's ruling on the motion. Plaintiff contends, however, that the trial judge expanded the ruling on the motion *in limine* to exclude other testimony about failure to chart.

■ First, plaintiff challenges the trial court's exclusion of a question posed to Dr. Thorpe as to whether he charted his examination of Mrs. Parekh at midnight on March 29, 1 1/2 hours prior to Sameer's birth. The trial court perceived no causal link between this failure to chart and the issues in the case. Our review of the record reveals that there is no evidence tending to establish that Dr. Thorpe's failure to chart prior to Sameer's birth caused any of his injuries. Thus, the trial court correctly excluded this evidence. See *Merlo v. Parisi* (1993), 255 Ill. App. 3d 53, 58, 627 N.E.2d 309 (in order to establish a violation of a duty to chart, the alleged failure must cause injury).

Plaintiff also challenges the trial court's refusal to permit defense expert Dr. Gardner to answer a charting question. After first ascertaining from Dr. Gardner that he did not see any evidence on Sameer's chart that he suffered from breathing irregularity, plaintiff's counsel asked Dr. Gardner, "And if the baby's breathing were irregular, under charting procedures, it would have been recorded?" The trial court sustained a general objection. Clearly this question called for speculation by Dr. Gardner, which the trial court is entitled to exclude. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 500 N.E.2d 8.) Furthermore, when the record contains evidence, as does the record here, that "it was standard to omit normal findings from the patient records," allegations of violation of a duty to chart cannot be used to establish that a physician did not examine a patient. (*Thome v. Palmer* (1986), 141 Ill. App. 3d 92, 94, 489 N.E.2d 1163.) Dr. Thorpe testified that doctors did "not necessarily" chart routine examinations. The trial court did not abuse its discretion in excluding the challenged testimony.

Plaintiff's final claim is that the cumulation of evidentiary and instructional errors warrants a new trial. We have found no significant error in the trial court proceedings. Indeed, the trial was well conducted and the issues fully and fairly presented. The judgment of the trial court is affirmed.

Affirmed.

SCARIANO, P.J., and DiVITO, J., concur.