FIRSTAR BANK OF ILLINOIS, as Guardian of Alojzy Klim, a Minor, Plaintiff-Appellee, v. RICHARD PEIRCE, Defendant-Appellant.

First District (4th Division)   No. 1—98—2579

Opinion filed June 30, 1999.

526

James J. Stamos, of Stamos & Trucco, of Chicago, for appellant.

Jeffrey M. Goldberg and Michael V. Marsh, both of Jeffrey M. Goldberg & Associates, Ltd., of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

In this medical negligence case the jury returned a verdict in favor of Firstar Bank of Illinois, as guardian of Alojzy Klim, and against the doctor who delivered the child. On appeal, the doctor contends the trial court erred by allowing testimony that violated Supreme Court Rule 213(g) and by refusing to give the jury a sole proximate cause instruction. 166 Ill. 2d R. 213(g). We agree. We reverse the trial court's judgment on the verdict and remand the cause for a new trial.

FACTS

Sophie Klim (Sophie) became pregnant for the first time in 1981. During Sophie's pregnancy, her obstetrician, Dr. Richard Peirce (Dr. Peirce), ordered a screen of Sophie's blood. Dr. Peirce discovered her blood contained no antigens and was "Rh negative."

In cases where a pregnant woman has Rh negative blood, an obstetrician must take special precautions. Often during pregnancy, and especially in delivery, a pregnant woman's blood will mix with her fetus' blood. If the woman has Rh negative blood containing no antigens, and the fetus has Rh positive blood containing antigens, the woman's body will respond to her fetus' blood by developing antibodies to attack the Rh positive antigens. The woman becomes "Rh sensitized."

This Rh sensitization usually does not affect the woman's first pregnancy, but may have dire consequences for her subsequent pregnancies. If the woman's subsequent fetuses are Rh positive, the woman's antibodies will cross the placenta to destroy her fetus' blood. Rh sensitization often necessitates serious medical treatment, including newborn blood transfusions.

Once Rh sensitization occurs, it is irreversible. However, an obstetrician can prevent Rh sensitization with a drug called "RhoGam," administered within 72 hours after the fetus' blood mixes with the woman's blood. The dosage of RhoGam depends on the amount of fetal blood to which the woman was exposed.

Sophie's pregnancy proceeded normally until shortly before her due date. On March 7, 1982, Sophie noticed her fetus had stopped

moving, and on March 8 she visited Dr. Peirce, who could not find a fetal heartbeat. On March 9, 1982, Dr. Peirce induced labor, and Sophie delivered a stillborn baby boy. Dr. Peirce again ordered a screen of Sophie's blood.

In the morning of March 10, Dr. Peirce received a laboratory report which showed Sophie's blood was Rh positive. Dr. Peirce assumed the report was inaccurate and ordered another blood screen. In the evening of March 10, Dr. Peirce received a second report which again showed Sophie's blood was Rh positive. In the morning of March 11, Dr. Peirce ordered a third blood screen. Hours later, when the third report confirmed the earlier reports, Dr. Peirce realized a fetal-to-maternal hemorrhage was a possible cause of death for Sophie's baby. In other words, Dr. Peirce suspected the fetus had bled into Sophie's circulatory system and ordered a Kleinhauer-Betke test to determine the amount of fetal blood in Sophie's circulation.

This test showed 10% of her circulation was fetal blood. Sophie's fetus had died from a near-total fetal-to-maternal hemorrhage. On March 11, approximately 48 hours after Sophie's stillbirth, Dr. Peirce said he consulted with Dr. Lloyd Cook (Dr. Cook), acting director of Northwestern University's blood bank, to obtain a figure for Sophie's blood volume. Dr. Peirce's notes say, "67 cc/kg (from Dr. Cook, chief blood bank-average blood volume)." Dr. Peirce then devised a formula for calculating the amount of RhoGam to give Sophie. Dr. Peirce's formula indicated Sophie should receive 11 doses of RhoGam. This formula underprescribed the amount of RhoGam. Sophie actually should have received 17 doses. Sophie became Rh sensitized; then she became pregnant again.

On April 5, 1983, Sophie gave birth to her son Alojzy Klim (Alojzy). Immediately after his birth, Alojzy required a newborn blood transfusion because of Sophie's Rh sensitization. This transfusion caused a stroke. On September 11, 1996, Firstar Bank (Firstar), as guardian for Alojzy, filed a complaint for Alojzy's injuries against Dr. Peirce.

After extensive discovery and a mistrial because of a deadlocked jury on October 3, 1997, Firstar retried its case against Dr. Peirce. On January 27, 1998, the jury returned a verdict of $600,462 in favor of Firstar, and the trial court entered judgment on this verdict. Dr. Peirce filed a posttrial motion. The trial court denied this motion on June 23, 1998. This appeal followed.

## DECISION

This case went to the jury on two issues of negligence. One, "a failure to administer RhoGAM in the appropriate dose to Sophie P. Klim commencing on March the 11th 1982"; and two, "failure to

perform a test after administering the dose to assure that [Dr. Peirce] had given the correct amount of RhoGAM."

Dr. Peirce contends trial court errors fatally infect both issues, requiring reversal and remand. To properly analyze Dr. Peirce's contentions, we have to examine each issue separately, parsing the facts and rulings that apply to each.

■ This approach is necessary because the jury rendered a general verdict. Neither party submitted special interrogatories on the allegations against Dr. Peirce. We can't tell what issue or issues the jury found in favor of Firstar. See *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 433, 412 N.E.2d 447 (1980); *Boll v. Chicago Park District*, 249 Ill. App. 3d 952, 962, 620 N.E.2d 1082 (1991). A general verdict can be sustained for any one of several bases of liability "and will not be reversed due to the impairment of one of the theories." *Luther v. Norfolk & Western Ry. Co.*, 272 Ill. App. 3d 16, 23-24, 649 N.E.2d 1000 (1995); see 735 ILCS 5/2—1201(d) (West 1996).

### 1. Sole Proximate Cause Jury Instruction

This issue relates to Dr. Peirce's alleged failure to administer the proper dose of RhoGam to Sophie. Dr. Peirce offered evidence that Northwestern University, a nonparty, caused the inappropriate dosage and, therefore, her Rh sensitization. At the close of the case, he offered both paragraphs of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1995). The trial court refused to give the instruction. It reads:

> "More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
>
> However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1995) (hereinafter IPI Civil 3d No. 12.04).

In the Notes on Use for IPI Civil 3d No. 12.04, the IPI committee said: "The second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of third persons." IPI Civil 3d No. 12.04, Notes on Use.

■ The sole proximate cause or "empty chair" defense "merely focuses the attention of a properly instructed jury *** on the plaintiff's

duty to prove that the defendant's conduct was a proximate cause of plaintiff's injury." *Leonardi v. Loyola University*, 168 Ill. 2d 83, 94, 658 N.E.2d 450 (1995).

■ We recently addressed this issue in *McDonnell v. McPartlin*, 303 Ill. App. 3d 391, 708 N.E.2d 412 (1999). In *McDonnell*, we emphasized the plaintiff has to prove the defendant's professional negligence: the plaintiff must establish "a standard of care, a deviation from that standard, and a causal connection between the deviation and the injuries sustained." *McDonnell*, 303 Ill. App. 3d at 394. In other words: "The element of proximate cause is an element of the *plaintiff's* case. The defendant is not required to plead lack of proximate cause as an affirmative defense." (Emphasis in original.) *Leonardi*, 168 Ill. 2d at 93-94.

■ "Whether a defendant is entitled to a sole proximate cause instruction depends on the evidence he presents." *McDonnell*, 303 Ill. App. 3d at 395. The defendant is not entitled to this instruction when the evidence merely shows his conduct was one of several causes of the injury. *McDonnell*, 303 Ill. App. 3d at 395. As the supreme court has held, "a sole proximate cause instruction is not appropriate unless there is evidence that the *sole* proximate cause (not 'a' proximate cause) of a plaintiff's injury is conduct of another person or condition." (Emphasis in original.) *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 134, 679 N.E.2d 1202 (1997).

■ The record contains evidence that only Northwestern University's conduct caused the dosage problem and consequently Sophie's sensitization.

At trial, Dr. Peirce testified he made his calculation of the RhoGam dose "in conjunction with Dr. Cook." Dr. Peirce said he "may well have made up a major part of [the formula] and discussed it with Dr. Cook." According to Dr. Peirce, Dr. Cook provided him with a blood volume figure of 67 cubic centimeters per kilogram. Dr. Peirce said:

> "At the time I was treating Mrs. Klim when I made my formula, I was at that point relying on advice from Dr. Cook, the chief of the Northwestern blood bank, Dr. Depp, the chief of obstetrics at Northwestern and Dr. Ennio Rossi, a hematologist at Northwestern."

Dr. Peirce testified he believed Northwestern University deviated from the standard of care when the blood bank (and Dr. Cook) supplied an erroneous blood volume figure.

Dr. Peirce's experts supported his testimony that Northwestern University caused Sophie's sensitization.

Dr. Allan Charles (Dr. Charles) testified Northwestern University deviated from the standard of care when the blood bank indicated So-

phie had Rh positive blood but failed to note a possible fetal-to-maternal hemorrhage. Dr. Charles said Dr. Peirce's formula should have yielded the correct RhoGam dose if he had used the accurate maternal blood volume figure. Dr. Charles observed the fetal-to-maternal hemorrhage here was so large, an obstetrician would need to consult the blood bank for a blood volume figure: "[T]hat's the kind of thing you would really have to call for some help on because it's so rare an occasion to have that happen." Dr. Charles later repeated, "I would have consulted with the experts to get the information directly." Dr. Charles concluded:

> "Dr. Peirce did what was appropriate for any doctor at that time, and that is to consult with the experts and assure that he got the best possible results, and he did that, and he complied with the standard of care by doing that."

Dr. Phillip DeChristopher (Dr. DeChristopher) agreed the blood bank should have reported the possibility of a fetal-to-maternal hemorrhage to Dr. Peirce. Dr. DeChristopher said Dr. Peirce acted reasonably in relying on the accuracy of Dr. Cook's blood volume figure. Dr. DeChristopher testified Northwestern University deviated from the standard of care when Dr. Cook provided Dr. Peirce with an erroneous maternal blood volume figure. Dr. DeChristopher noted Sophie's sensitization may have been prevented if Dr. Cook had provided the correct figure.

True, Dr. Cook, in his videotaped evidence deposition, said he never recommended the formula to anyone, including Dr. Peirce. Nor did he remember offering Dr. Peirce a blood volume figure for pregnant women. Dr. Cook insisted he would have referred Dr. Peirce to the obstetrical service had the question been asked about the correct RhoGam dose. This conflict in the testimony was an issue for the jury to resolve and has no bearing on whether the sole proximate cause instruction should have been given. The question is whether there was sufficient evidence to support the giving of both paragraphs of IPI Civil 3d No. 12.04. See *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 973, 702 N.E.2d 303 (1998).

The testimony of Dr. Peirce, Dr. Charles, and Dr. DeChristopher points to Northwestern University as the sole cause of the dosage problem and of Sophie's sensitization. For that reason, the trial court erred when it refused the instruction. The refusal is sufficient to create reversible error on the dosage issue.

We now proceed to determine whether the post-dosage failure to test issue retains enough vitality to support the general verdict.

### 2. Post-dosage Testing and Supreme Court Rule 213

Dr. Peirce contends the testimony of three of Firstar's witnesses—Dr. Michael Socol, Dr. Donald Sacher, and Dr. Cook—violated the letter and spirit of Rule 213. We agree with Dr. Peirce's contention concerning Dr. Sacher. We do not agree the testimony of Dr. Socol or Dr. Cook clearly violated the rule.

First, we review the applicable law.

■ Illinois Supreme Court Rule 213(g) provides:

"An opinion witness is a person who will offer any opinion testimony. Upon written interrogatory, the party must state:
  (i) the subject matter on which the opinion witness is expected to testify;
  (ii) the conclusions and opinions of the opinion witness and the bases therefor; and
  (iii) the qualifications of the opinion witness;
and provide all reports of the opinion witness." 166 Ill. 2d R. 213(g).

Supreme Court Rule 213(i) provides:

"A party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party.

If a deposition of an opinion witness is taken, the witness' testimony at trial will be limited to the opinion expressed therein, in addition to those opinions identified in answers to Rule 213(g) interrogatories.

The opinions expressed in a deposition need not be later specifically identified in Rule 213(g) answers but, upon objection at trial, the burden is on the proponent of the witness to prove the opinions were provided in deposition or Rule 213(g) interrogatory." 177 Ill. 2d R. 213(i).

Supreme Court Rule 213 imposes mandatory disclosure requirements for opinion witnesses. *Adami v. Belmonte*, 302 Ill. App. 3d 17, 22, 704 N.E.2d 708 (1998); *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 536, 690 N.E.2d 143 (1998). A party must provide the subject matter, conclusions, opinions, qualifications, and reports of any opinion witnesses. *Iser v. Copley Memorial Hospital*, 288 Ill. App. 3d 408, 411, 680 N.E.2d 747 (1997).

Rule 213 permits litigants to rely on the disclosed opinions of opposing experts and to construct their trial strategy accordingly. *McMath v. Katholi*, 304 Ill. App. 3d 369, 377 (1999) (purposes of Rule 213 are "elimination of surprise, expediting trial preparation, and improving discovery procedures"); see *Chicago & Illinois Midland Ry. Co. v. Crystal Lake Industrial Park, Inc.*, 225 Ill. App. 3d 653, 658, 588 N.E.2d 337 (1992).

Allowing either party to ignore Rule 213's strictures would encourage "sandbagging," defeating the rule's laudable purposes. *Crull*, 294

Ill. App. 3d at 537. As the committee comments to Rule 213(g) emphasize: "[I]n order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule ***, and that no new or additional opinions will be allowed unless the interests of justice require otherwise." 177 Ill. 2d R. 213(g), Committee Comments, at xxx-xxxi; see *McGrew v. Pearlman*, 304 Ill. App. 3d 697, 705 (1999).

■ "Where a party fails to comply with the provisions of Rule 213, a court should not hesitate sanctioning the party, as Rule 213 demands strict compliance." *Warrender v. Millsop*, 304 Ill. App. 3d 260, 268 (1999). Sanctions for Rule 213(g) violations include barring the undisclosed witness from testifying. *Ashpole v. Brunswick Bowling & Billiards Corp.*, 297 Ill. App. 3d 725, 727, 697 N.E.2d 1238 (1998).

Dr. Sacher's trial testimony included opinions about post-RhoGam testing which Firstar failed to disclose in discovery.

On March 13, 1997, Firstar filed answers to Dr. Peirce's Rule 213 interrogatories. Firstar disclosed Dr. Sacher would testify

"that Dr. Peirce deviated from the standard of care by failing to administer the appropriate dose of RhoGAM in a timely manner.

That the dose of 11 vials [of] RhoGAM administered to Sophie Klim was inadequate.

That there was a substantial delay in the initiation of treatment in light of available evidence earlier indicating that testing and the administration of RhoGAM should have begun earlier.

That the RhoGAM should have been administered in a quicker fashion rather than over a period of 48 hours as was done in this case.

Proper treatment including appropriate dosage of RhoGAM administered in a timely fashion would have prevented Sophie Klim from becoming sensitized or, at a minimum, would have increased the likelihood that treatment would have been successful in preventing her sensitization."

The record contains eight excerpts of various lengths from Dr. Sacher's discovery deposition. In these excerpts, Dr. Sacher does not offer an opinion on post-RhoGam testing. Instead, Dr. Sacher said Dr. Peirce deviated from the standard of care in other ways, including his failure to give the correct RhoGam dose.

After the mistrial, Firstar filed its "DISCLOSURES PURSUANT TO RULES 213 AND 220" on October 14, 1997. According to Firstar:

"Dr. Sacher is expected to testify that Dr. Peirce deviated from the standard of care by failing to administer the appropriate dose of Rhogam in a timely fashion; that the dose administered of 11 vials was inadequate; that there was a substantial delay in the initiating of treatment in light of the available evidence earlier indicating that testing and administration of Rhogam should have begun

earlier; that the Rhogam should have been administered in a timely fashion rather than over a forty-eight (48) hour period; and that proper treatment including appropriate dosage of Rhogam administered in a timely fashion would have prevented Sophie Klim from becoming sensitized or, at a minimum, would have increased the likelihood of the treatment being successful in preventing her sensitization. Further, Dr. Sacher will be testifying in rebuttal to the opinions expressed by Dr. DeChristopher as to the appropriate actions and responsibilities of a blood bank including opinions by Dr. DeChristopher that it was the blood bank's responsibility to advise of maternal blood volume and formulation."

At trial, Dr. Sacher testified Dr. Peirce deviated from the standard of care in three ways: first, by failing "to recognize and diagnose feto-maternal hemorrhage as soon as he was provided information that alerted him or should have alerted him to the fact that it occurred"; second, by failing "to expeditiously give [RhoGam]"; and third, by failing "to give the right dose of [RhoGam]." Firstar's attorney then asked, "Doctor, is there any way for an obstetrician to determine whether they've given the correct dose?" Dr. Peirce's attorney objected, saying Dr. Sacher's answer would violate Rule 213 because Firstar never disclosed Dr. Sacher would testify about post-RhoGam testing.

The trial court disagreed, ruling that the expected answer would serve to explain Dr. Sacher's previous answers.

Dr. Sacher then testified an obstetrician can check the correct dose only by a post-RhoGam test "to see whether there is excess antibody in the serum of the fluid phase of the blood." Firstar's attorney then asked, "Doctor, do you have an opinion as to whether it is a deviation from the reasonably accepted standards of care for an obstetrician not to do that test after administering RhoGAM?" Dr. Peirce's attorney objected again, and the court overruled the objection. Dr. Sacher answered, "It is a standard that has been used and is, I believe, articulated in some of the obstetrical texts."

This exchange followed:

"[FIRSTAR'S ATTORNEY]: Would it then be a deviation from reasonable practice for an obstetrician not to do this test after administering RhoGAM?

[DR. PEIRCE'S ATTORNEY]: Same objection.

THE COURT: Overruled.

DR. SACHER: Under the circumstances of this case, recognizing that there was such a substantial fetomaternal hemorrhage, I believe that it should have been evaluated to see whether, in fact, the dosage was appropriate.

[FIRSTAR'S ATTORNEY]: And failure to do that is a deviation?

DR. SACHER: Yes.

[DR. PEIRCE'S ATTORNEY]: Same objection.

THE COURT: Overruled. Is there an ongoing objection to this?

[DR. PEIRCE'S ATTORNEY]: Yes, there is, most certainly.

THE COURT: All right. Let the record note that.

[FIRSTAR'S ATTORNEY]: Doctor, is there any other way, other than checking after administering RhoGAM, that a physician can be reasonably assured that they've given an adequate RhoGAM dosage?

DR. SACHER: Not to my knowledge."

On cross-examination after the court's ruling, there was this exchange between Dr. Peirce's attorney and Dr. Sacher:

"Q. When we met at your deposition a couple years ago, at the end of that deposition, I asked you if you'd given me all your opinions. Do you recall that?

A. I do, yes.

Q. And at that deposition, you never said anything about performing a test after giving RhoGAM, did you?

A. I did not.

Q. And in fact, when [Firstar's attorney] this morning asked you, what are your opinions, you gave three opinions, and one of them was not a test should have been done after RhoGAM was given, was it?

A. No.

Q. When [Firstar's attorney] asked you that regarding whether the standard of care required that, was that the first time you and he ever talked about that?

A. It may have been. I'm certainly aware of that test, and you never asked me that question.

Q. But I did ask you if you had any other opinions, though, right, and you said, no?

A. That is correct.

Q. Okay. So the first time you ever had any idea that you would be giving that opinion was when [Firstar's attorney] asked it of you in this courtroom?

A. That is correct.

Q. So he heard it for the first time then, and I heard it for the first time then; right?

A. Presumably, yes."

■ This testimony violated Rule 213 and should have been barred. Firstar's interrogatory answers do not mention Dr. Sacher's opinions on post-RhoGam testing. Dr. Sacher testified at trial his deposition testimony did not cover his opinions on post-RhoGam testing. Firstar's attorney obviously knew what Dr. Sacher's opinions would be when he solicited them at trial. This was the kind of ambush the supreme court

rule is designed to avoid. Rule 213 brings to a trial a degree of certainty and predictability that furthers the administration of justice. The rule should be enforced by trial judges.

The trial court characterized this testimony as a "natural corollary" to Dr. Sacher's other opinions, but we disagree. While Dr. Sacher's opinion on post-RhoGam testing related to his opinion on the correct RhoGam dose, Dr. Sacher offered a standard-of-care conclusion regarding post-RhoGam testing. This conclusion indicates Dr. Sacher's testing opinion was independent of his dosage opinion. Additionally, Rule 213(g) mandates disclosure of all opinions and "the bases therefor." 166 Ill. 2d R. 213(g)(ii); see *Crull*, 294 Ill. App. 3d at 537-38.

Dr. Peirce contends his trial strategy was to isolate Dr. Socol's opinion about post-RhoGam testing. This strategy, questionable as it might be, was undermined when the trial court, after Dr. Socol's testimony, allowed Dr. Sacher to testify about post-RhoGam testing. Once Dr. Sacher's opinion linked with Dr. Socol's opinion on testing, Firstar's evidence on the issue became very strong.

In fact, Firstar's attorney devoted part of his closing argument to post-RhoGam testing:

> "In what ways are we contending that Dr. Peirce was negligent? We're really saying two things, because it boils down to two issues: One, did he administer the correct dose of RhoGAM? Number two, did he do anything that was reasonable, did he check after he gave the dose to determine whether is was appropriate?
>
> * * *
>
> I believe, ladies and gentlemen, that when we've reviewed all the evidence in this case, you will see, as I have, that Dr. Peirce was not reasonable. Dr. Peirce did not follow reasonably accepted standards. And, more importantly, Dr. Peirce did absolutely nothing to check afterwards.
>
> * * *
>
> *** Dr. Peirce had available to him—he had available to him a means for preventing this whole thing from happening. Dr. Sacker [*sic*] was our expert; he's from Georgetown, he's a hemotologist; he does obstetric hematology. We brought in someone who has both hematology and obstetric background to explain this to you.
>
> Dr. Sacker [*sic*] had no ax to grind. And what does he come in and say? He said, I don't care what formula you use ***. But you've got to check."

The testimony of Dr. Sacher—testimony which violated Rule 213—provided substantial support for one of two allegations in this case: "failure to perform a test after administering the dose to assure he had given the correct amount of RhoGAM." The trial court abused its discretion by allowing Dr. Sacher to offer undisclosed opinions on post-RhoGam testing.

We believe the erroneous admission of Dr. Sacher's undisclosed opinions created reversible error on the post-dosage testing issue. Because we reach that conclusion, there is no need to set out the testimony of Doctors Socol and Cook. We presume surprise will not be a component of a third trial of this case.

### 3. Other Issues

Dr. Peirce contends the trial court abused its discretion in other ways during the trial. Because the case has to be tried again, extended discussion about these issues is unnecessary. With the exception of matters already discussed, we believe the trial court's evidentiary rulings and decisions on jury instructions were within its discretion. We would observe, however, the trial court incorrectly characterized certain out-of-court statements as hearsay.

Dr. Peirce's testimony about words spoken to him by Dr. Richard Depp (Dr. Depp), a veteran Northwestern University obstetrician, did not constitute hearsay. That is, the purported statements were not being offered for the truth of the matter asserted. See *Leonardi*, 168 Ill. 2d at 99; *Tomaszewski v. Godbole*, 174 Ill. App. 3d 629, 637, 529 N.E.2d 260 (1988). Instead, the statements were being offered to show their effect on the listener, Dr. Peirce, to explain his actions and beliefs.

Because Dr. Peirce failed to make clear his purpose in offering the testimony about Dr. Depp's statements, we find no error. Should the issue occur again on retrial, the trial court could consider a timely jury instruction to limit the evidence to its proper purpose.

In reaching our decision to reverse and remand this case, we have considered Firstar's claim that Dr. Peirce's trial testimony included a judicial admission that obviates any need to consider the issues raised on appeal. We have examined that testimony and find it does not contain a judicial admission of negligence. At best, Dr. Peirce's testimony was equivocal, not the "clear and unequivocal statement which is made without reasonable chance of mistake about a matter within the speaker's personal knowledge." *Burns v. Michelotti*, 237 Ill. App. 3d 923, 932, 604 N.E.2d 1144 (1992).

## CONCLUSION

We find the trial court committed reversible error on the dosage issue by refusing Dr. Peirce's sole proximate cause instruction. We also find the trial court committed reversible error on the failure-to-test issue by allowing Dr. Sacher's surprise testimony. For these reasons, we

538

reverse the trial court's judgment on the jury's verdict and remand the cause for a new trial.

Reversed and remanded.

HOFFMAN and HALL, JJ., concur.