STEVEN BECHT, Plaintiff-Appellee, v. SUSAN PALAC, Defendant-Appellant.

First District (2nd Division) No. 1—99—3703

Opinion filed September 26, 2000.—Rehearing denied December 8, 2000.—Modified opinion filed December 12, 2000.

Dennis A. Ferraro, of Chuhak & Tecson, P.C., of Chicago, for appellant.

James J. Graney, of James J. Graney & Associates, of Rolling Meadows, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

The plaintiff, Steven Becht, sued the defendants, Dr. Susan Palac and Dr. Edward Lisberg, for medical negligence. Specifically, Becht alleged that the defendants negligently prescribed steroidal medication that caused him to develop a bone disease called avascular necrosis.

The jury found Dr. Palac liable and awarded Becht damages in the amount of $1,500,000. Dr. Lisberg was found not liable. Dr. Palac filed a posttrial motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion.

Dr. Palac now appeals, arguing that: (1) the plaintiff's evidence on causation was so insufficient and unreliable that she is entitled to a judgment notwithstanding the verdict or a new trial; (2) the trial court erred by allowing the plaintiff to elicit opinions never disclosed pursuant to discovery Rule 213 (177 Ill. 2d R. 213); (3) the trial court erred by allowing misstatements of evidence during the plaintiff's closing argument; and (4) the trial court abused its discretion by failing to send certain demonstrative exhibits to the jury during its deliberation.

For the reasons that follow, we affirm the trial court's decision.

BACKGROUND

On September 17, 1990, the plaintiff, Steven Becht, a 27-year-old UPS driver, went to MacNeal Hospital's emergency room complaining of a headache and double vision. He reported that he fell and hit his head two nights earlier. The emergency room physician ordered a CT scan and called Dr. Palac, a neurologist, to examine Becht.

The CT scan of his brain showed multiple "small petechial hemorrhages" (small areas of bleeding) rimmed with edema or swelling—otherwise his neurological exam appeared normal. Dr. Palac believed that the fourth cranial nerve, which controls eye movement, was injured and causing Becht's double vision. The controversy in this case revolves around her prescription of Decadron, a corticosteroid she recommended to decrease his brain edema. She prescribed the following initial dose: 4 milligrams, three times a day for five days.

Becht returned a week later for a follow-up on September 24, 1990. He still had double vision but no new symptoms. So, Dr. Palac did not prescribe any Decadron. However, the next day she prescribed a "weaning" dose of Decadron over the phone because Becht complained of some stiffness in his hips and legs. She did not recall prescribing this second dose, but she acknowledged that the pharmacy records indicated a phone prescription for Decadron. Becht took this "weaning" dose for nine consecutive days (September 25 through October 3) at decreasing doses of 12 milligrams each day for the first three days, 8 milligrams per day for the next three days, and 4 milligrams per day for the final three days.

Upon Dr. Palac's referral, Dr. Mizen, a neuro-ophthalmologist, examined Becht on September 27, 1990, and diagnosed a right fourth cranial nerve palsy and possibly left fourth nerve palsy. He did not

prescribe any medications and advised that fourth nerve palsies normally resolve without treatment in 6 to 12 weeks. Dr. Palac saw Becht two more times after this and, although his double vision was less, it still had not completely resolved. Dr. Palac's impression was traumatic, slowly resolving fourth nerve palsies, but she testified that she was worried that the nerve had been affected in the brain stem. She sent Becht for an MRI to get a better picture of the brain stem than a CT scan. She wrote that if the MRI was within normal limits, she would return him to Dr. Mizen.

The MRI was taken on November 20, 1990, and its findings are subject to conflicting testimony. The MRI showed other areas of hemorrhage not previously seen on the CT scan. In Dr. Palac's view, these were new areas of bleeding, confirming that this was a progressive injury which justified her initial dose of Decadron. In contrast, Becht's expert, Dr. Margulies, testified that the MRI showed no new bleeding and merely showed the subtle footprints from the original injury.

In any event, Becht did not return to see Dr. Palac and Dr. Mizen took over his care. Becht's last visit to Dr. Mizen was November 26, 1990, and his double vision still had not cleared. His double vision gradually resolved by the end of December 1990 and he was able to return to work at that time.

Becht received his next dose of steroids seven months later from codefendant Dr. Lisberg for his asthma. On May 11, 1991, Dr. Lisberg prescribed prednisone at 60 milligrams a day for seven days. When Becht called Dr. Lisberg after taking the prednisone dose complaining of leg and hip pain, Dr. Lisberg did not represcribe a weaning dose of prednisone. Instead, he prescribed trisilate, a type of aspirin.

Two and a half months after this final dose of steroids, Becht saw Dr. Daniel Hirsen, a rheumatologist, complaining of hip and leg pain on August 2, 1991. Dr. Hirsen diagnosed Becht with avascular necrosis (AVN) of both hip joints. AVN means that the blood supply to the affected bone has stopped, which causes the heads of the femur to die due to lack of oxygen. It is undisputed that steroids can cause AVN. Subsequently, the plaintiff suffered hip replacement surgery on both hips.

Becht sued Dr. Palac and Dr. Lisberg for negligently prescribing medication that caused his AVN. At trial, plaintiff called three expert witnesses: Dr. Gershwin, Dr. Forberg and Dr. Margulies. Additionally, he called Dr. Milgram, an orthopedic surgeon who performed replacement surgery on his left hip. Dr. Milgram was also called to testify by Dr. Palac in her case in chief.

Becht's first expert, Dr. Gershwin, a professor of medicine and chief of allergy and immunology at the University of California at Da-

vis, had published a number of books and papers discussing asthma and treatment of steroids. Based on his experience, literature reviewed and practice, Gershwin testified that corticosteroids caused Becht's AVN. He stated that Decadron is a much more potent drug than prednisone: one 5-milligram tablet of prednisone is equivalent to .75 milligrams of Decadron. When asked whether it was the Decadron or prednisone which caused the AVN, he replied that it was both—they were intertwined. He based this on the time frame in which Becht developed AVN: after taking the Decadron, 9 months later he received prednisone, and 2 1/2 months after that he was diagnosed with AVN. Although he could not separate the two drugs, Gershwin believed that if Becht had only gotten the prednisone, he would not have developed AVN. He conceded that it would be uncommon for someone to develop AVN after taking just Dr. Palac's prescription of Decadron, but he also testified, "I think it's possible, but I can't separate them (the Decadron and prednisone)."

Becht's next expert, Dr. Paul Forberg, an orthopedic surgeon, testified that the total dosages of steroids that Becht received were sufficient to cause AVN. He based this opinion on his experience and literature that he reviewed. Based on a reasonable degree of medical certainty, he testified that the dosage of Decadron prescribed by Dr. Palac "at least contributed, may have caused some degree of avascular necrosis." He based this opinion on literature reviews that short courses of steroid therapy, repeated with periods of time with no steroid administration, predispose a patient to develop AVN. He believed that Becht fit this profile because there were three periods of time Becht took steroids. Forberg testified that, from the time of steroid dose, patients usually develop AVN within two years. He also surmised that the aches and pains Becht experienced after Dr. Palac's initial dose may well have been avascular pain as a result of AVN. He stated that he could not be 100% certain, but it "follows the picture." Forberg believed that there was some contribution from all three doses of steroids—the two doses prescribed by Dr. Palac and the one dose of prednisone by Dr. Lisberg.

Becht's last expert, Dr. Sheldon Margulies, received his board certification in neurology in 1979. He had been staff neurologist and assistant professor of neurology at Johns Hopkins University Hospital since 1990. Dr. Margulies testified that Dr. Palac not only breached the standard of care, but that her prescription of Decadron proximately caused Becht's injury. Based on the medical records and his experience, he believed that Becht had suffered a very mild head injury, with no active bleeding. His neurological signs were normal except for the double vision. Specifically, Dr. Margulies agreed with Dr. Palac's as-

sessment that a fourth cranial nerve palsy caused Becht's double vision. However, unlike Dr. Palac, he did not believe that the fourth nerve was injured within the brain stem at the nucleus. He opined that the most common cause of fourth nerve palsy is an injury to the peripheral nerve after it leaves the brain stem. Based on the CT scan and MRI, Margulies believed that Becht's head injury caused the tentorium, a tough canvas membrane outside the brain stem, to cause a "judo chop" to the fourth cranial nerve. This resulted in his double vision. He opined that Becht.had no significant edema that justified prescribing Decadron. He concluded that Dr. Palac breached the standard of care by prescribing Decadron to a neurologically normal patient and exposing him to the risk of AVN. Additionally, he stated that Dr. Palac breached the standard of care by represcribing Decadron for aches that could go away with aspirin.

Dr. Margulies further testified that the Decadron caused Becht's AVN. He based this opinion on several factors. First, he received dosages of medication "known" to cause AVN. He believed that the timing was appropriate, because Becht developed AVN about one year after exposure to Decadron. Lastly, the bilateral nature of Becht's AVN suggested a blood-borne problem related to medication. On cross-examination, Dr. Margulies conceded that it would be uncommon for someone to develop AVN by taking the Decadron dosage prescribed by Dr. Palac. He identified one study that he relied upon, *A Cross Study Evaluation of Association between Steroid Dose and Bolus Steroids and Avascular Necrosis of Bone*, by David T. Felson and Jennifer J. Anderson in the journal The Lancet.

Dr. James Milgram, the orthopedic surgeon who replaced Becht's left hip, testified in both Becht's and Dr. Palac's cases in chief. He identified himself as an expert on the causal relationship between steroid treatment and AVN because he reviewed a lot of literature on the subject. He opined that Becht's AVN was probably "idiopathic"—meaning, no known cause. He believed that it was unlikely that Dr. Palac's dosage caused or contributed to Becht's AVN. However, he stated that the length of time from the initial prescription of steroids to the diagnosis of the disease falls within the pattern of steroid-induced AVN.

In addition to Dr. Milgram, Dr. Palac called three other physicians to testify: Dr. Daniel Hirsen, Dr. Michael Jerva and Dr. Thomas Zizic. Dr. Hirsen, who first diagnosed Becht's avascular necrosis, received his board certification in internal medicine and rheumatology. Relying on Becht's medical records and a reasonable degree of medical and surgical certainty, he agreed with Dr. Milgram's assessment that Becht's AVN was "idiopathic." He opined that Becht's disease was un-

related to steroids because Becht only received high dose steroids for two weeks. He explained that a patient must take high dose steroids for at least one or two months to develop AVN. He concluded that the dosage in Becht's case was high enough; it just was not long enough to produce AVN.

Dr. Palac's next expert, Dr. Jerva, was a neurological surgeon who chaired the department of neurosurgery at Mercy Hospital and was a professor of neurosurgery at the University of Illinois. He has published numerous articles in the field of neurosurgery and neurology. Based on Becht's medical records, Dr. Jerva concluded that Becht had sustained a severe and progressive head injury. If Dr. Palac had not prescribed Decadron, he believed that Becht could have suffered irreversible damage even to the point of coma and death. He opined that there was no reason to believe that Decadron resulted in Becht's AVN. He did concede that Becht's neurological exam was completely normal and that there was no neurological reason for prescribing a "weaning" dose of Decadron.

Dr. Palac's last expert, Dr. Zizic, was a board-certified rheumatologist who published several articles on avascular necrosis. He testified that his own study of 54 patients, which was published in the American Journal of Medicine, demonstrated that a patient had to have continuous high dose steroid therapy for a minimum of two months in order to develop AVN. Based on his own study and the same Lancet article that Dr. Margulies relied upon, Dr. Zizic concluded that the doses of Decadron received by Becht could not have caused his AVN. Additionally, he stated that Becht never developed the "cushingoid" symptoms usually associated with steroid-induced AVN. Instead, he opined that Becht's AVN was caused by a special coagulation defect of the blood. He based this opinion on the progressive bleeding shown on the MRI of Becht's brain, together with Becht's elevated cholesterol levels.

At the conclusion of the trial, Dr. Palac's motion for directed verdict was denied. The jury returned a verdict against Dr. Palac and in favor of her codefendant, Dr. Lisberg. Dr. Palac filed a timely posttrial motion requesting either a judgment notwithstanding the verdict or a new trial. Dr. Palac's posttrial motion was denied. Dr. Palac filed this timely notice of appeal.

ANALYSIS

I

On appeal, Dr. Palac first contends that the plaintiff's evidence on causation was so unreliable and insufficient that she should be entitled

to a judgment notwithstanding the verdict or, alternatively, a new trial. Initially, she urges the court to apply the admissibility standards set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), although she does not argue against the admissibility of the evidence. This is similar to an issue raised in *Damron v. Micor Distributing, Ltd.*, 276 Ill. App. 3d 901, 907, 658 N.E.2d 1318 (1995).

In *Damron* the plaintiff argued that the defendant's expert testimony was so speculative that the jury's verdict was against the manifest weight of the evidence. The defendant responded that the plaintiff waived this issue because he failed to object at trial that the plaintiff's evidence was speculative. The court, however, found that the defendant misstated the issue. The issue was not whether the plaintiff's expert testimony was speculative. Instead, the court reasoned that the issue is whether the jury's verdict was against the manifest weight of the evidence based on the plaintiff's testimony. *Damron*, 276 Ill. App. 3d at 907.

Like the defendant in *Damron*, Dr. Palac misstates the issue by arguing that this court should apply standards used to judge the admissibility of evidence. The issue is not whether the testimony of Becht's experts was unreliable. Rather, the issue is whether the jury's verdict was against the manifest weight of evidence based on the testimony of Becht's experts.

■ A jury's verdict is against the manifest weight of evidence if the opposite conclusion is clearly evident or if the jury's findings are unreasonable, arbitrary and not based upon any of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992); *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1087, 560 N.E.2d 969 (1990). A judgment notwithstanding the verdict ought to be entered only if all of the evidence, when viewed in light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967); *Hernandez v. Schittek*, 305 Ill. App. 3d 925, 929-30, 713 N.E.2d 203 (1999). "Furthermore, it is an abuse of discretion for a trial court to grant a motion for a new trial when there is sufficient evidence to support the jury's verdict." *Damron*, 276 Ill. App. 3d at 907; *Krawczyk v. Polinksi*, 267 Ill. App. 3d 258, 265, 642 N.E.2d 185 (1994).

■ Specifically, Dr. Palac argues that all three of Becht's experts based their testimony regarding causation on literature, but never identified the nature, title, author or citation of any of this literature. This testimony related to whether the specific doses of Decadron

caused Becht's AVN. However, Dr. Palac appears to know exactly the nature of this literature. In her brief she identifies "anecdotal case reports" as the *only* literature Becht's experts based their causation testimony on, and she contends that such case reports are inherently unreliable. She concludes that she could not cross-examine Becht's experts regarding these case reports, because the trial court excluded this literature due to nondisclosure under Supreme Court Rule 213.

We reject this argument for two reasons: (1) experts are permitted to testify based on inadmissible literature and Dr. Palac was not precluded from cross-examining these experts; and (2) the record reveals that Becht's experts relied on bases other than anecdotal case reports to support their causation theory.

Addressing the first point, an expert witness may base an opinion on facts not in evidence if they are of a type reasonably relied upon by experts in the particular field in forming opinions. *Thorne v. Palmer*, 141 Ill. App. 3d 92, 94, 489 N.E.2d 1163 (1986). However, such facts and data can be obtained during cross-examination. *Melecosky v. McCarthy Brothers Co.*, 115 Ill. 2d 209, 215, 503 N.E.2d 355 (1986). Applying this rule, it was proper for Becht's medical experts to base their testimony on literature without identifying it on direct exam. Dr. Palac could have cross-examined these experts as to their opinions in light of the professional literature from which they formed their opinions as well as other relevant medical literature. *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 356 N.E.2d 779 (1976). Additionally, Dr. Palac does not explain her reason for failing to cross-examine one of Becht's experts, Dr. Margulies, regarding his conclusions based on an article in the journal Lancet. This article was properly disclosed and admitted into evidence.

Moreover, the record does not support Dr. Palac's contention that "anecdotal case reports" were the only basis for Becht's expert testimony. Neither Dr. Gershwin, Dr. Forberg nor Dr. Margulies affirmatively stated that he relied upon such case reports. Instead, Becht's attorney simply referred to these case reports when cross-examining Dr. Palac's expert witnesses.

Additionally, Becht's experts relied upon other bases for their conclusions. For example, Dr. Forberg opined that the Decadron at least contributed to and may have caused the AVN based on the time association between steroids and AVN. He explained that AVN usually develops within two years from the time of dosage. Since Becht was diagnosed with AVN 11 months after taking the Decadron, he fell within the appropriate time frame for steroidal-induced AVN. Based on his experience as well as literature reviewed, he believed that Becht received a sufficient amount of steroids to cause AVN.

Similarly, Dr. Gershwin emphasized the temporal association between the steroids and AVN to conclude that steroids caused Becht's disease. The facts that Becht received two courses of Decadron, nine months later took one course of prednisone, then 2½ months later was diagnosed with AVN formed the basis for his conclusion that both the Decadron and prednisone caused the AVN. He also believed that, without the Decadron, Becht would not have gotten the AVN.

Finally, Dr. Margulies also based his conclusion that Decadron caused the AVN upon time—that it was appropriate for Becht to develop AVN within one year after exposure to Decadron. He also pointed to the bilateral nature of the disease. The fact that Becht developed AVN symmetrically and simultaneously in both hips suggested to him that this was a blood-borne problem related to medication. He claimed that cases where patients developed AVN from the specific dosage prescribed by Dr. Palac were "well reported" and that he relied upon an article in the journal Lancet for some of his conclusions.

It is clear that Becht's experts had a factual basis to support their conclusion—namely, the temporal association between steroids and AVN. While it is true that Dr. Gershwin only stated that "it's possible" and Dr. Forberg opined that the Decadron "may have caused" AVN, an expert's opinion regarding the cause of an injury is not improper or inadmissible because it is couched in terms of probabilities or possibilities based upon certain assumed facts. *McKenzie v. SK Hand Tool Corp.*, 272 Ill. App. 3d 1, 8, 650 N.E.2d 612 (1995); *Damron*, 276 Ill. App. 3d at 911; *Conners v. Poticha*, 293 Ill. App. 3d 944, 950, 689 N.E.2d 313 (1997).

We note that there is conflicting testimony from Dr. Palac's experts as to the cause of Becht's injury. However, a reviewing court can neither set aside a verdict simply because the jury could have drawn different conclusions from conflicting testimony nor substitute its judgment for that of the jury in determining the weight of conflicting evidence. *Damron*, 276 Ill. App. 3d at 911. Thus, we conclude that the jury's verdict was not against the manifest weight of the evidence.

## II

Dr. Palac next contends that the testimony of two expert witnesses—Dr. Milgram and Dr. Margulies—violated Supreme Court Rules 213(g) and (i) (177 Ill. 2d Rs. 213(g), (i)). Effective January 1, 1996, Rule 213 replaced Supreme Court Rule 220 in setting forth the disclosure requirements for opinion witnesses. *See f v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 21, 724 N.E.2d 115 (1999). Rule 213(g) provides:

"An opinion witness is a person who will offer any opinion testimony. Upon written interrogatory, the party must state:

> (i) the subject matter on which the opinion witness is expected to testify;
>
> (ii) the conclusions and opinions of the opinion witness and the bases therefor; and
>
> (iii) the qualifications of the opinion;

and provide all reports of the opinion witness." 177 Ill. 2d R. 213(g). Rule 213(i) provides:

"A party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party.

If a deposition of an opinion witness is taken, the witness' testimony at trial will be limited to the opinion expressed therein, in addition to those opinions identified in answers to Rule 213(g) interrogatories.

The opinions expressed in a deposition need not be later specifically identified in Rule 213(g) answers but, upon objection at trial, the burden is on the proponent of the witness to prove the opinions were provided in deposition or Rule 213(g) interrogatory." 177 Ill. 2d R. 213(i).

■ Under Rule 213, upon written interrogatory, each party must disclose the subject matter, conclusions, opinions, qualifications and reports of a witness who will offer any opinion testimony. *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 536, 714 N.E.2d 116 (1998). The purpose of this rule is to avoid surprise and permit litigants to ascertain and rely upon the opinions of experts retained by their adversaries. *Crull*, 294 Ill. App. 3d at 537. The trial court's ruling regarding admission of evidence pursuant to Rule 213 will not be reversed absent an abuse of discretion. *Seef*, 311 Ill. App. 3d at 22.

Dr. Palac relies on several cases, including *Karr v. Noel*, 212 Ill. App. 3d 575, 571 N.E.2d 271 (1991), and *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 724 N.E.2d 115 (1999), to support her position. In *Karr*, the reviewing court found that old Rule 220 prevented the defendant physician, Dr. Tschoe, from basing an opinion at trial on medical articles or texts which were not properly disclosed during his deposition. Specifically, the court noted that when asked during deposition what texts he relied upon to form his opinion, Dr. Tschoe replied that he could not remember the names of any. *Karr*, 212 Ill. App. 3d at 581. However, at trial Dr. Tschoe described certain medical texts as authoritative and indicated that they supported his opinion. *Karr*, 212 Ill. App. 3d at 580. Due to this inconsistency, the court held that Tschoe's testimony regarding authoritative texts clearly exceeded the scope of his deposition testimony. *Karr*, 212 Ill. App. 3d at 583.

In *Seef*, the reviewing court found several Rule 213 violations where the defendant's expert, Dr. Depp, testified about matters not previously disclosed during discovery. Although elaborating on a disclosed opinion does not automatically violate Rule 213, the court found that the statements at issue were not encompassed by Dr. Depp's original opinions. *Seef*, 311 Ill. App. 3d at 23. For example, Dr. Depp's testimony that "diagnosis of amnionitis would have been very difficult because [the plaintiff] might have had the flu, strep throat, or a sore throat" was more than a mere elaboration on Dr. Depp's original opinion that the "baby's death due to infection was unforeseeable." *Seef*, 311 Ill. App. 3d at 24. The court found similar erroneous admissions because the cited testimony stated new reasons for the opinion, rather than logical corollaries. *Seef*, 311 Ill. App. 3d at 23.

■ In the present case, Dr. Palac cites three instances of Rule 213 violations. We disagree and find that all three cases are distinguishable from the violations noted in *Karr* and *Seef*. First, she contends that Becht elicited improper testimony from Becht's orthopedic surgeon, Dr. Milgram, when he affirmed that Dr. Palac's dosage of Decadron "has been reported to be sufficient to cause avascular necrosis." Dr. Palac argues that, in his discovery deposition, Dr. Milgram never gave any testimony that there was "literature" showing that the specific dosages of Decadron at issue were sufficient to cause AVN.

His discovery deposition reveals, however, that he answered questions as to whether he believed Dr. Palac's dosage of Decadron caused Becht's AVN.

"Q. Again, Doctor, it's impossible for you to say to a reasonable degree of medical certainty that the course of steroids prescribed by Dr. Palac caused or contributed *** to the development of osteonecrosis in this patient?

A. I don't think you can be flat-footed about it, but I think it's unlikely because of the low dose and the short duration of doses."

At this point, Dr. Milgram did not explicitly cite literature to support his view. However, later in the deposition, he identified himself as an expert regarding the causal relation between specific doses of steroids and AVN. He based this expertise on "literature."

"Q. Do you consider yourself to be an expert in the area of the causal relation between steroid treatment and osteonecrosis and its development?

A. I probably am because I've had a long interest in it, I've sort of looked at a lot of literature on it.

* * *

Q. Would you consider yourself sufficiently expert in the area of

the use of steroids causing osteonecrosis to comment on the dosage as to what specific doses can cause it as to others?

A. I'm only citing the literature *** it goes all over the place, but I think you can say that there's a predominance in higher doses for longer times."

Dr. Milgram did testify that the literature "goes all over the place" with respect to specific doses of steroids causing AVN. Thus, Dr. Palac cannot be surprised at Dr. Milgram's testimony about "literature" and specific causation when he testified to both during discovery. Unlike *Karr*, there was no inconsistency between his discovery deposition and the statement at issue.

Dr. Palac's next two Rule 213 allegations follow a similar pattern. They both stem from testimony regarding the readings of an MRI by Dr. Margulies, Becht's expert neurologist. In the first case, Dr. Margulies' testimony (the location of a lesion was nowhere near the fourth cranial nucleus) was a logical corollary to Dr. Margulies' original opinion that the lesion was located nowhere near the site of dysfunction. Similarly, Dr. Margulies' second opinion (the MRI showed no new bleeding) was a corollary to his original statement that the MRI showed subtle footprints left from the original bleeding, but the actual hemorrhages were gone.

Thus, we conclude that the trial court did not abuse its discretion when it allowed the testimony at issue.

### III

■ Dr. Palac next argues that the trial court abused its discretion by allowing improper statements during Becht's closing argument. Generally, improper comments at closing do not constitute reversible error unless the defendant is substantially prejudiced and denied a fair trial. *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1061, 645 N.E.2d 284 (1994). The trial court's decision will not be reversed absent a clear abuse of discretion. *Heeg v. Jewel Cos.*, 232 Ill. App. 3d 75, 81, 596 N.E.2d 765 (1992). During closing argument, counsel is allowed broad latitude in drawing reasonable conclusions from the evidence. *Tierney*, 268 Ill. App. 3d at 1061.

Dr. Palac cites five instances of improper argument. In all five cases, Dr. Palac's counsel objected and the court instructed the jury to rely upon its memory. We will first address two comments that fall within the "broad latitude" accorded to counsel. Counsel's statement that Dr. Palac handed out Decadron like "candy," though inflammatory, is a fair comment on the evidence. Similarly, Becht's counsel referred to a medical textbook which states that AVN has been reported following short courses with high doses of steroids. Counsel reasonably commented that this textbook reported that AVN occurs in

the types of doses prescribed by Dr. Palac. Dr. Palac argues that the textbook term "short courses" meant at least two months and Becht only took Decadron for two weeks. However, counsel did not specifically state that the book referred to the exact dose prescribed by Dr. Palac but, rather, "these *types* of doses." (Emphasis added.)

The next three comments misstate the evidence, but we find these to be harmless error. First, in referring to the second dose of Decadron, counsel stated that Dr. Palac "more than doubles him up again with the same drug." However, the second dose (72 milligrams) was less than double the first (60 milligrams). Since Dr. Palac's testimony was earlier that morning, however, it was not prejudicial to allow the jury to rely upon its memory for the correct dosage.

Second, Becht's counsel quoted a passage from Dr. Milgram's evidence deposition in which he affirms that 168 milligrams of Decadron over the course of two weeks is certainly a dosage that could cause AVN. This dose was higher than the one prescribed by Dr. Palac, 132 milligrams. However, counsel quotes Dr. Milgram to support his comment that, "[Y]ou even heard Dr. Milgram testify with regard to the fact that these were high enough. They were long enough." After Dr. Palac's objection, counsel quickly restated the correct dosage prescribed by Dr. Palac. Since the jury heard the right amount of dosage immediately after the misstatement, we find this to be harmless error.

Lastly, Dr. Palac's expert, Dr. Zizic, had testified at trial that specialized coagulation studies were not performed in this case to detect whether a blood defect caused Becht's AVN. Plaintiff's counsel argued that this was "sheer fabrication" and pointed to coagulation profiles that were done before Becht's hip replacement. Counsel misstated the evidence because the blood tests he referred to were simply normal studies performed before surgery, and not the specialized coagulation studies mentioned by Dr. Zizic. Although this was a misstatement, we find that counsel's comment was harmless error. *Tierney*, 268 Ill. App. 3d at 1061.

For the foregoing reasons, we hold that any misstatements of evidence by Becht's counsel during closing argument were harmless error.

## IV

Finally, Dr. Palac argues that the court abused its discretion by denying the jury's request for certain exhibits during deliberation. We disagree.

The trial court has considerable discretion in determining whether an exhibit may be taken into the jury room. *People ex rel. Department*

*of Transportation v. Smith*, 258 Ill. App. 3d 710, 717, 631 N.E.2d 266 (1994). This decision lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Merlo v. Parisi*, 255 Ill. App. 3d 53, 61, 627 N.E.2d 309 (1993).

██ During the first day of its deliberation, the jury specifically requested to see certain demonstrative exhibits used by Dr. Palac during the trial. These exhibits consisted mainly of blow-up images of the CT scan and MRI of Becht's brain. Counsel for codefendant Dr. Lisberg objected, arguing that all of the evidence should go back or none at all. Becht's attorney also objected, contending that Becht's exhibits should also go back to the jury room. The trial judge reasoned that he would allow the jury's request only if all three of the attorneys agreed. Since there was no concurrence, the judge denied the jury's request.

More than likely, the attorneys were concerned that sending only Dr. Palac's exhibits back would unduly emphasize her evidence. By denying the jury's request, the trial court did not abuse its discretion. *Wetherell v. Matson*, 52 Ill. App. 3d 314, 318, 367 N.E.2d 472 (1977). Thus, we hold that the trial court did not abuse its discretion.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.